## HARRIS *v.* UNITED STATES.

No. 34.   Argued December 12, 13, 1946.—Decided May 5, 1947.

*Herbert K. Hyde* and *Roy St. Louis* argued the cause, and *Mr. Hyde* filed a brief, for petitioner.

*Frederick Bernays Wiener* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington, Robert S. Erdahl, Beatrice Rosenberg* and *Leon Ulman.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

Petitioner was convicted on sixteen counts of an indictment [1] charging the unlawful possession, concealment and

---

[1] The indictment contained nineteen counts. Petitioner was convicted on the second, which charged the fraudulent concealment of 8 Notice of Classification Cards, DSS Form 57, and 11 Registration Certificates, DSS Form 2; the third, which charged fraudulent possession with intent to convert to his own use the above-mentioned property; the fourth through tenth, charging the unlawful alteration of a Notice of Classification card; the twelfth and fourteenth through

alteration of certain Notice of Classification Cards and Registration Certificates in violation of § 11 of the Selective Training and Service Act of 1940,[2] and of § 48 of the Criminal Code.[3]  Prior to the trial, petitioner moved to suppress the evidence, which served as the basis for the conviction, on the grounds that it had been obtained by means of an unreasonable search and seizure contrary to the provisions of the Fourth Amendment[4] and that to permit the introduction of that evidence would be to violate the self-incrimination clause of the Fifth Amend-

nineteenth, charging the unlawful possession of an altered Notice of Classification Card.  Petitioner was acquitted on the first count, which charged theft of government property.  Count 11, which charged alteration of a Notice of Classification card, and count 13, which charged possession of an altered card, were dismissed.  Petitioner was sentenced to imprisonment for a term of five years on each of the sixteen counts indicated, the sentences to run concurrently.

[2] 54 Stat. 885, 894–895, 50 U. S. C. App. § 311.  Section 623.61–2 of the Selective Service Regulations states that "It shall be a violation of these regulations for any person to have in his possession" a Notice of Classification not regularly issued to him or to alter or forge any Notice of Classification.  Section 11 of the Act makes the failure to perform any duty required by the Regulations punishable by imprisonment for not more than five years or a fine of not more than $10,000.00 or both.

[3] 35 Stat. 1098, 18 U. S. C. § 101.  Insofar as pertinent, the section provides: "Whoever shall receive, conceal, or aid in concealing, or shall have or retain in his possession with intent to convert to his own use or gain, any . . . property of the United States, which has theretofore been embezzled, stolen, or purloined by any other person, knowing the same to have been so embezzled, stolen, or purloined, shall be fined not more than $5,000, or imprisoned not more than five years, or both; . . ."

[4] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

ment.[5]  The motion to suppress was denied, and petitioner's numerous objections to the evidence at the trial were overruled.  The Circuit Court of Appeals affirmed the conviction.  151 F. 2d 837.  Certiorari was granted because of the importance of the questions presented.

Two valid warrants of arrest were issued.  One charged that petitioner and one Moffett had violated the Mail Fraud Statute [6] by causing a letter addressed to the Guaranty Trust Company of New York to be placed in the mails for the purpose of cashing a forged check for $25,000.00 drawn on the Mudge Oil Company in pursuance of a scheme to defraud.  The second warrant charged that petitioner and Moffett, with intent to defraud certain banks and the Mudge Oil Company, had caused a $25,000.00 forged check to be transported in interstate commerce, in violation of § 3 of the National Stolen Property Act.[7]

Five agents of the Federal Bureau of Investigation, acting under the authority of the two warrants, went to the apartment of petitioner in Oklahoma City and there arrested him.  The apartment consisted of a living room, bedroom, bathroom and kitchen.  Following the arrest, which took place in the living room, petitioner was handcuffed and a search of the entire apartment was undertaken.  The agents stated that the object of the search was to find two $10,000.00 canceled checks of the Mudge Oil Company which had been stolen from that company's office and which were thought to have been used in effecting the forgery.  There was evidence connecting petitioner with that theft.  In addition, the search was said to be for the purpose of locating "any means that might

---

[5] Insofar as pertinent, the Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself, . . ."

[6] 35 Stat. 1130–1131, 18 U. S. C. § 338.

[7] 53 Stat. 1178–1179, 18 U. S. C. § 413 et seq.

have been used to commit these two crimes, such as burglar tools, pens, or anything that could be used in a confidence game of this type." [8]

One agent was assigned to each room of the apartment and, over petitioner's protest, a careful and thorough search proceeded for approximately five hours. As the search neared its end, one of the agents discovered in a bedroom bureau drawer a sealed envelope marked "George Harris, personal papers." The envelope was torn open and on the inside a smaller envelope was found containing eight Notice of Classification cards and eleven Registration Certificates bearing the stamp of Local Board No. 7 of Oklahoma County. It was this evidence upon which the conviction in the District Court was based and against which the motion to suppress was directed. It is conceded that the evidence is in no way related to the crimes for which petitioner was initially arrested and that the search which led to its discovery was not conducted under the authority of a search warrant.[9]

In denying the motion to suppress, the District Court wrote no opinion. The Circuit Court of Appeals affirmed

---

[8] The agents who testified in the proceedings in the trial court clearly stated that the object of the search was the means employed in committing the crimes charged in the warrants of arrest. None of the subsequent statements of the agents, if read in their context, are in conflict with that assertion.

[9] It appears that the checks were never found. Respondent concedes that, in addition to the draft cards, seven pens and a quantity of tissue paper capable of being employed as instruments of forgery were seized. Also taken were twenty-seven pieces of celluloid which at the trial were demonstrated to be useful in picking a lock. It was respondent's theory that petitioner had obtained the canceled checks by theft from the offices of the Mudge Oil Company and that entry into the offices had been achieved in that manner. Petitioner alleged in his motion to suppress that various other items were taken, including sheets of blank paper, expense bills and receipts, personal mail, letters, etc.

the conviction, finding that the search was carried on in good faith by the federal agents for the purposes expressed, that it was not a general exploratory search for merely evidentiary materials, and that the search and seizure were a reasonable incident to petitioner's arrest.[10]

If it is true, as petitioner contends, that the draft cards were seized in violation of petitioner's rights under the Fourth Amendment, the conviction based upon evidence so obtained cannot be sustained. *Boyd* v. *United States,* 116 U. S. 616 (1886); *Weeks* v. *United States,* 232 U. S. 383 (1914); *Agnello* v. *United States,* 269 U. S. 20 (1925); *Segurola* v. *United States,* 275 U. S. 106 (1927). This Court has consistently asserted that the rights of privacy and personal security protected by the Fourth Amendment ". . . are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen . . ." *Gouled* v. *United States,* 255 U. S. 298, 304 (1921).

This Court has also pointed out that it is only unreasonable searches and seizures which come within the constitutional interdict. The test of reasonableness cannot be stated in rigid and absolute terms. "Each case is to be decided on its own facts and circumstances." *Go-Bart Importing Company* v. *United States,* 282 U. S. 344, 357 (1931).

The Fourth Amendment has never been held to require that every valid search and seizure be effected under the authority of a search warrant. Search and seizure incident to lawful arrest is a practice of ancient origin [11] and has long been an integral part of the law-enforcement

---

[10] 151 F. 2d 837.

[11] See opinion of Cardozo, J., in *People* v. *Chiagles,* 237 N. Y. 193, 142 N. E. 583 (1923); *Trial of Henry and John Sheares,* 27 How. St. Tr. 255, 321 (1798).

procedures of the United States [12] and of the individual states.[13]

The opinions of this Court have clearly recognized that the search incident to arrest may, under appropriate circumstances, extend beyond the person of the one arrested to include the premises under his immediate control. Thus in *Agnello* v. *United States, supra,* at 30, it was said: "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted." [14]   It is equally clear that a search incident to arrest, which is otherwise reasonable, is not automatically rendered invalid by the fact that a dwelling place, as contrasted to a business premises, is subjected to search.[15]

---

[12] Examples of the practice are to be found in numerous cases in this Court and in the lower federal courts. *Weeks* v. *United States, supra; Agnello* v. *United States, supra; Carroll* v. *United States,* 267 U. S. 132 (1925) ; *United States* v. *Lee,* 274 U. S. 559 (1927) ; *Marron* v. *United States,* 275 U. S. 192 (1927) ; *Go-Bart Importing Company* v. *United States, supra; United States* v. *Lefkowitz,* 285 U. S. 452 (1932) ; *Parks* v. *United States,* 76 F. 2d 709 (1935) ; *United States* v. *71.41 Ounces Gold,* 94 F. 2d 17 (1938) ; *Matthews* v. *Correa,* 135 F. 2d 534 (1943).

[13] *Argetakis* v. *State,* 24 Ariz. 599, 212 Pac. 372 (1923) ; *Commonwealth* v. *Phillips,* 224 Ky. 117, 5 S. W. 2d 887 (1928); *Banks* v. *Farwell,* 21 Pick. (Mass.) 156 (1839). And see cases cited in 32 A. L. R. 697 ; 51 A. L. R. 434.

[14] Similar expressions may be found in the cases cited in notes 12 and 13. There is nothing in the *Go-Bart* and *Lefkowitz* cases, *supra,* which casts doubt on this proposition.

[15] Stricter requirements of reasonableness may apply where a dwelling is being searched. *Davis* v. *United States,* 328 U. S. 582 (1946) ; *Matthews* v. *Correa, supra,* at 537.

152

Nor can support be found for the suggestion that the search could not validly extend beyond the room in which petitioner was arrested.[16]  Petitioner was in exclusive possession of a four-room apartment.  His control extended quite as much to the bedroom in which the draft cards were found as to the living room in which he was arrested. The canceled checks and other instrumentalities of the crimes charged in the warrants could easily have been concealed in any of the four rooms of the apartment. Other situations may arise in which the nature and size of the object sought or the lack of effective control over the premises on the part of the persons arrested may require that the searches be less extensive.  But the area which reasonably may be subjected to search is not to be determined by the fortuitous circumstance that the arrest took place in the living room as contrasted to some other room of the apartment.

Similar considerations are applicable in evaluating petitioner's contention that the search was, in any event, too intensive.  Here again we must look to the particular circumstances of the particular case.  As was observed by the Circuit Court of Appeals: "It is not likely that the checks would be visibly accessible.  By their very nature they would have been kept in some secluded spot . . . ." The same meticulous investigation which would be appropriate in a search for two small canceled checks could not be considered reasonable where agents are seeking a stolen automobile or an illegal still.  We do not believe that

[16] Searches going beyond the room of arrest were upheld in the *Agnello* and *Marron* cases, *supra*.  The searches found to be invalid in the *Go-Bart* and *Lefkowitz* cases were so held for reasons other than the areas covered by the searches.  It has not been the understanding of the lower federal courts that the search in every case must be so confined.  See, for example: *United States* v. *Lindenfeld*, 142 F. 2d 829 (1944); *Matthews* v. *Correa, supra; United States* v. *71.41 Ounces Gold, supra*.

the search in this case went beyond that which the situation reasonably demanded.

This is not a case in which law enforcement officials have invaded a private dwelling without authority and seized evidence of crime. *Amos* v. *United States,* 255 U. S. 313 (1921); *Byars* v. *United States,* 273 U. S. 28 (1927); *Nueslein* v. *District of Columbia,* 73 App. D. C. 85, 115 F. 2d 690 (1940). Here the agents entered the apartment under the authority of lawful warrants of arrest. Neither was the entry tortious nor was the arrest which followed in any sense illegal.

Nor is this a case in which law-enforcement officers have entered premises ostensibly for the purpose of making an arrest but in reality for the purpose of conducting a general exploratory search for merely evidentiary materials tending to connect the accused with some crime. *Go-Bart Company* v. *United States, supra; United States* v. *Lefkowitz, supra.* In the present case the agents were in possession of facts indicating petitioner's probable guilt of the crimes for which the warrants of arrest were issued. The search was not a general exploration but was specifically directed to the means and instrumentalities by which the crimes charged had been committed, particularly the two canceled checks of the Mudge Oil Company. The Circuit Court of Appeals found and the District Court acted on the assumption that the agents conducted their search in good faith for the purpose of discovering the objects specified. That determination is supported by the record. The two canceled checks were stolen from the offices of the Mudge Oil Company. There was evidence connecting petitioner with that theft. The search which followed the arrest was appropriate for the discovery of such objects. Nothing in the agents' conduct was inconsistent with their declared purpose.

154

Furthermore, the objects sought for and those actually discovered were properly subject to seizure. This Court has frequently recognized the distinction between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime.[17] Clearly the checks and other means and instrumentalities of the crimes charged in the warrants toward which the search was directed as well as the draft cards which were in fact seized fall within that class of objects properly subject to seizure. Certainly this is not a case of search for or seizure of an individual's private papers, nor does it involve a prosecution based upon the expression of political or religious views in such papers.[18]

Nor is it a significant consideration that the draft cards which were seized were not related to the crimes for which petitioner was arrested. Here during the course of a valid search the agents came upon property of the United States in the illegal custody of the petitioner. It was property of which the Government was entitled to possession.[19]

---

[17] Boyd v. United States, supra, at 623–624; Weeks v. United States, supra, at 392–393; Gouled v. United States, supra, at 309; Carroll v. United States, supra, at 149–150; Agnello v. United States, supra, at 30; Marron v. United States, supra, at 199; United States v. Lefkowitz, supra, at 465–466. The same distinction is drawn in numerous cases in the lower federal courts: Matthews v. Correa, supra, at 537; United States v. Lindenfeld, supra, at 832; In re Ginsburg, 147 F. 2d 749, 751 (1945).

[18] Entick v. Carrington, 19 How. St. Tr. 1030, 1073–1074 (1765).

[19] Davis v. United States, supra at 590. And see Boyd v. United States, supra, 623–624; Wilson v. United States, 221 U. S. 361, 380 (1911).

In keeping the draft cards in his custody petitioner was guilty of a serious and continuing offense against the laws of the United States. A crime was thus being committed in the very presence of the agents conducting the search. Nothing in the decisions of this Court gives support to the suggestion that under such circumstances the law-enforcement officials must impotently stand aside and refrain from seizing such contraband material. If entry upon the premises be authorized and the search which follows be valid, there is nothing in the Fourth Amendment which inhibits the seizure by law-enforcement agents of government property the possession of which is a crime, even though the officers are not aware that such property is on the premises when the search is initiated.[20]

The dangers to fundamental personal rights and interests resulting from excesses of law-enforcement officials committed during the course of criminal investigations are not illusory. This Court has always been alert to protect against such abuse. But we should not permit our knowledge that abuses sometimes occur to give sinister coloration to procedures which are basically reasonable. We conclude that in this case the evidence which formed the basis of petitioner's conviction was obtained without violation of petitioner's rights under the Constitution.

*Affirmed.*

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE concur, dissenting.

Because I deem the implications of the Court's decision to have serious threats to basic liberties, I consider it important to underscore my concern over the outcome of this

---

[20] *Milam* v. *United States,* 296 F. 629 (1924); *United States* v. *Old Dominion Warehouse,* 10 F. 2d 736 (1926); *United States* v. *Two Soaking Units,* 48 F. 2d 107 (1931); *Paper* v. *United States,* 53 F. 2d 184 (1931); *Benton* v. *United States,* 70 F. 2d 24 (1934); *Matthews* v. *Correa, supra.*

case.   In *Davis* v. *United States*, 328 U. S. 582, the Court narrowed the protection of the Fourth Amendment [1] by extending the conception of "public records" for purposes of search without warrant.[2]   The Court now goes far beyond prior decisions in another direction—it permits rummaging throughout a house without a search warrant on the ostensible ground of looking for the instruments of a crime for which an arrest, but only an arrest, has been authorized.   If only the fate of the Davises and the Harrises were involved, one might be brutally indifferent to the ways by which they get their deserts.   But it is precisely because the appeal to the Fourth Amendment is so often made by dubious characters that its infringements call for alert and strenuous resistance.   Freedom of speech, of the press, of religion, easily summon powerful support against encroachment.   The prohibition against unreasonable search and seizure is normally invoked by those accused of crime, and criminals have few friends. The implications of such encroachment, however, reach far beyond the thief or the black-marketeer.   I cannot give legal sanction to what was done in this case without accepting the implications of such a decision for the future,

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] While this case presents a situation not involved in the *Davis* case, or in *Zap* v. *United States*, 328 U. S. 624, so that the Court's conclusion cannot rest on those cases, it is appropriate to note that neither of those cases carries the authority of a majority of the Court. Aside from the fact that a constitutional adjudication of recent vintage and by a divided Court may always be reconsidered, I am loath to believe that these decisions by less than a majority of the Court are the last word on issues of such far-reaching importance to constitutional liberties.

implications which portend serious threats against precious aspects of our traditional freedom.

If I begin with some general observations, it is not because I am unmindful of Mr. Justice Holmes' caution that "General propositions do not decide concrete cases." *Lochner* v. *New York,* 198 U. S. 45, 76. Whether they do or not often depends on the strength of the conviction with which such "general propositions" are held. A principle may be accepted "in principle," but the impact of an immediate situation may lead to deviation from the principle. Or, while accepted "in principle," a competing principle may seem more important. Both these considerations have doubtless influenced the application of the search and seizure provisions of the Bill of Rights. Thus, one's views regarding circumstances like those here presented ultimately depend upon one's understanding of the history and the function of the Fourth Amendment. A decision may turn on whether one gives that Amendment a place second to none in the Bill of Rights, or considers it on the whole a kind of nuisance, a serious impediment in the war against crime.

The provenance of the Fourth Amendment bears on its scope. It will be recalled that James Otis made his epochal argument against general warrants in 1761.[3]

---

[3] For reports of Otis' famous argument, see 2 Adams, Works pp. 523–25; Tudor, Life of James Otis, c. VI; Quincy's Massachusetts Reports pp. 471 *et seq.* (see also pp. 51–55); American History Leaflets, No. 33. And see the tribute of John Adams to Otis, Samuel Adams, and Hancock in 8 Old South Leaflets p..57 (No. 179).

"The seizure of the papers of Algernon Sidney, which were made use of as the means of convicting him of treason, and of those of Wilkes about the time that the controversy between Great Britain and the American Colonies was assuming threatening proportions, was probably the immediate occasion for this constitutional provision. See Leach *v.* Money, Burr. 1742; S. C., 1 W. Bl. 555, 19 State Trials, 1001, and Broom, Const. Law, 525; Entick *v.* Carrington, 2 Wils. 275;

Otis' defense of privacy was enshrined in the Massachusetts Constitution of 1780 in the following terms:

"XIV. Every subject has a right to be secure from all unreasonable searches, and seizures of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities, prescribed by the laws."

In the meantime, Virginia, in her first Constitution (1776), incorporated a provision on the subject narrower in scope:

"X. That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offence is not particularly described and supported by evidence, are grievous and oppressive, and ought not to be granted."

When Madison came to deal with safeguards against searches and seizures in the United States Constitution, he did not draw on the Virginia model but based his proposal on the Massachusetts form. This is clear proof that Congress meant to give wide, and not limited, scope to this protection against police intrusion.

---

S. C., 19 State Trials, 1030, and Broom, Const. Law, 558; May, Const. Hist., ch. 10; Trial of Algernon Sidney, 9 State Trials, 817." Cooley, Principles of Constitutional Law (1st ed.) 212, n. 2.

Historically we are dealing with a provision of the Constitution which sought to guard against an abuse that more than any one single factor gave rise to American independence. John Adams surely is a competent witness on the causes of the American Revolution. And he it was who said of Otis' argument against search by the police, not unlike the one before us, "American independence was then and there born." 10 Adams, *Works* 247. That which lay behind immunity from police intrusion without a search warrant was expressed by Mr. Justice Brandeis when he said that the makers of our Constitution

"conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment."

To be sure, that was said by him in a dissenting opinion in which he, with Mr. Justice Holmes, Mr. Justice Butler and Mr. Justice Stone applied the prohibition of the Fourth Amendment to wiretapping without statutory authority. *Olmstead* v. *United States,* 277 U. S. 438, 478. But with only an occasional deviation, a series of decisions of this Court has construed the Fourth Amendment "liberally to safeguard the right of privacy." *United States* v. *Lefkowitz,* 285 U. S. 452, 464. (See an analysis of the cases in the Appendix to this opinion.) Thus, the federal rule established in *Weeks* v. *United States,* 232 U. S. 383, as against the rule prevailing in many States, renders evidence obtained through an improper search inadmissible no matter how relevant. See *People* v. *Defore,* 242 N. Y. 13, 150 N. E. 585, and Chafee, The Progress of the Law 1919–1922, 35 Harv. L. Rev. 673, 694 *et seq.* And

160

long before the *Weeks* case, *Boyd* v. *United States*, 116 U. S. 616, gave legal effect to the broad historic policy underlying the Fourth Amendment.[4] The *Boyd* opinion has been the guide to the interpretation of the Fourth Amendment to which the Court has most frequently recurred.

It is significant that the constitution of every State contains a clause like that of the Fourth Amendment and often in its precise wording. Nor are these constitutional provisions historic survivals. New York was alone in not having a safeguard against unreasonable search and seizure in its constitution. In that State, the privilege of privacy was safeguarded by a statute. It tells volumes that in 1938, New York, not content with statutory protection, put the safeguard into its constitution.[5] If

---

[4] Compare the answers to certified questions given by this Court in *Gouled* v. *United States*, 255 U. S. 298, with the forecast made by a student of the subject of known partiality in favor of civil liberties. Fraenkel, Concerning Searches and Seizures, 34 Harv. L. Rev. 361, 385–87. As pointed out by Professor Zechariah Chafee, Jr., in each instance where the *Gouled* case differs from Mr. Fraenkel's forecast, "the Court gave increased force to the constitutional guarantee." Chafee, The Progress of the Law 1919–1922, 35 Harv. L. Rev. 673, 699.

[5] It is not without interest to note the first appearance of provisions dealing with search and seizure in State constitutions: Alabama: I, 9 (1819); Arizona: II, 8 (1911); Arkansas: II, 9 (1836); California: I, 19 (1849); Colorado: II, 7 (1876); Connecticut: I, 8 (1818); Delaware: I, 6 (1792); Florida: I, 7 (1838); Georgia: I, 18 (1865); Idaho: I, 17 (1889); Illinois: VIII, 7 (1818); Indiana: I, 8 (1816); Iowa: I, 8 (1846); Kansas: I, 14 (1855); Kentucky: XII (1792); Louisiana: Tit. VII, Art. 108 (1864); Maine: I, 5 (1819); Maryland: Decl. of Rights, XXIII (1776); Massachusetts: Part the First, Art. XIV (1780); Michigan: I, 8 (1835); Minnesota: I, 10 (1857); Mississippi: I, 9 (1817); Missouri: XIII, 13 (1820); Montana: III, 7 (1889); Nebraska: I, 7 (1875); Nevada: I, 18 (1864); New Hampshire: I, XIX (1784); New Jersey: I, 6 (1844); New Mexico: II, 10 (1910); North Carolina: Decl. of Rights, XI (1776);

one thing on this subject can be said with confidence it is that the protection afforded by the Fourth Amendment against search and seizure by the police, except under the closest judicial safeguards, is not an outworn bit of Eighteenth Century romantic rationalism but an indispensable need for a democratic society.

The Fourth Amendment, we have seen, derives from the similar provision in the first Massachusetts Constitution. We may therefore look to the construction which the early Massachusetts Court placed upon the progenitor of the Fourth Amendment:

> "With the fresh recollection of those stirring discussions [respecting writs of assistance], and of the revolution which followed them, the article in the Bill of Rights, respecting searches and seizures, was framed and adopted. This article does not prohibit all searches and seizures of a man's person, his papers, and possessions; but such only as are 'unreasonable,' and the foundation of which is 'not previously supported by oath or affirmation.' The legislature were not deprived of the power to authorize search warrants for probable causes, supported by oath or affirmation, and for the punishment or suppression of any violation of law." *Commonwealth* v. *Dana,* 2 Met. (Mass.) 329, 336.

The plain import of this is that searches are "unreasonable" unless authorized by a warrant, and a warrant

North Dakota: I, 18 (1889); Ohio: VIII, 5 (1802); Oklahoma: II, 30 (1907); Oregon: I, 9 (1857); Pennsylvania: Decl. of Rights, X (1776); Rhode Island: I, 6 (1842); South Carolina: I, 22 (1868); South Dakota: VI, 11 (1889); Tennessee: XI, 7 (1796); Texas: Decl. of Rights, 5 (1836), I, 7 (1845); Utah: I, 14 (1895); Vermont: c. I, XI (1777); Virginia: Bill of Rights, 10 (1776); Washington: I, 7 (1889); West Virginia: II, 3 (1861–63); Wisconsin: I, 11 (1848); Wyoming: I, 4 (1889).

hedged about by adequate safeguards. "Unreasonable" is not to be determined with reference to a particular search and seizure considered in isolation. The "reason" by which search and seizure is to be tested is the "reason" that was written out of historic experience into the Fourth Amendment. This means that, with minor and severely confined exceptions, inferentially a part of the Amendment, every search and seizure is unreasonable when made without a magistrate's authority expressed through a validly issued warrant.

It is noteworthy that Congress has consistently and carefully respected the privacy protected by the Fourth Amendment. Because they realized that the dangers of police abuse were persisting dangers, the Fathers put the Fourth Amendment into the Constitution. Because these dangers are inherent in the temptations and the tendencies of the police, Congress has always been chary in allowing the use of search warrants. When it has authorized them it has circumscribed their use with particularity. In scores upon score of Acts, Congress authorized search by warrant only for particular situations and in extremely restricted ways. Despite repeated importunities by Attorneys General of the United States, Congress long refused to make search by warrant generally available as a resource in aid of criminal prosecution. It did not do so until the first World War, and even then it did not do so except under conditions carefully circumscribed.

The whole history of legislation dealing with search and seizure shows how warily Congress has walked precisely because of the Fourth Amendment. A search of the entire premises for instruments of crime merely as an incident to a warrant of arrest has never been authorized by Congress. Nor has Congress ever authorized such search without a warrant even for stolen or contraband goods. On the contrary, it is precisely for the search of such goods

that specific legislative authorization was given by Congress. Warrants even for such search required great particularity and could be issued only on adequate grounds. (For a table of Congressional legislation, with indication as to its scope, see the Appendix to the dissenting opinion in the *Davis* case, 328 U. S. at 616.)

This is the historic background against which the undisputed facts of this case must be projected. For me the background is respect for that provision of the Bill of Rights which is central to enjoyment of the other guarantees of the Bill of Rights. How can there be freedom of thought or freedom of speech or freedom of religion, if the police can, without warrant, search your house and mine from garret to cellar merely because they are executing a warrant of arrest? How can men feel free if all their papers may be searched, as an incident to the arrest of someone in the house, on the chance that something may turn up, or rather, be turned up? Yesterday the justifying document was an illicit ration book, tomorrow it may be some suspect piece of literature.

The Court's reasoning, as I understand it, may be briefly stated. The entry into Harris' apartment was lawful because the agents had a warrant of arrest. The ensuing search was lawful because, as an incident of a lawful arrest, the police may search the premises on which the arrest took place since everything in the apartment was in the "possession" of the accused and subject to his control. It was lawful, therefore, for the agents to rummage the apartment in search for "instruments of the crime." Since the search was lawful, anything illicit discovered in the course of the search was lawfully seized. In any event, the seizure was lawful because the documents found were property of the United States and their possession was a continuing crime against the United States.

Much is made of the fact that the entry into the house was lawful. But we are not confined to issues of trespass. The protection of the Fourth Amendment extends to improper searches and seizures, quite apart from the legality of an entry. The Amendment asserts the "right of the people to be secure" not only "in their persons, houses," but also in their "papers, and effects, against unreasonable searches and seizures." It is also assumed that because the search was allegedly for instruments of the crime for which Harris was arrested it was *ipso facto* justified as an incident of the arrest. It would hardly be suggested that such a search could be made without warrant if Harris had been arrested on the street. How, then, is rummaging a man's closets and drawers more incidental to the arrest because the police chose to arrest him at home? For some purposes, to be sure, a man's house and its contents are deemed to be in his "possession" or "control" even when he is miles away. Because this is a mode of legal reasoning relevant to disputes over property, the usual phrase for such non-physical control is "constructive possession." But this mode of thought and these concepts are irrelevant to the application of the Fourth Amendment and hostile to respect for the liberties which it protects. Due regard for the policy of the Fourth Amendment precludes indulgence in the fiction that the recesses of a man's house are like the pockets of the clothes he wears at the time of his arrest.

To find authority for ransacking a home merely from authority for the arrest of a person is to give a novel and ominous rendering to a momentous chapter in the history of Anglo-American freedom. An Englishman's home, though a hovel, is his castle, precisely because the law secures freedom from fear of intrusion by the police except under carefully safeguarded authorization by a magistrate.

To derive from the common law right to search the person as an incident of his arrest the right of indiscriminate search of all his belongings, is to disregard the fact that the Constitution protects both unauthorized arrest and unauthorized search.  Authority to arrest does not dispense with the requirement of authority to search.

But even if the search was reasonable, it does not follow that the seizure was lawful.  If the agents had obtained a warrant to look for the cancelled checks, they would not be entitled to seize other items discovered in the process.  *Marron* v. *United States*, 275 U. S. 192, 196.[6] Harris would have been able to reclaim them by a motion to suppress evidence.  Such is the policy of the Fourth Amendment, recognized by Congress and reformulated in the New Rules of Criminal Procedure adopted only last year.  See Rule 41 (e) superseding the Act of June 15, 1917, 40 Stat. 228, 229.  The Court's decision achieves the novel and startling result of making the scope of search without warrant broader than an authorized search.

These principles are well established.  While a few of the lower courts have uncritically and unwarrantedly extended the very limited search without warrant of a person upon his lawful arrest, such extension is hostile to the policy of the Amendment and is not warranted by the precedents of this Court.

"It is important to keep clear the distinction between prohibited searches on the one hand and improper seizures on the other.  See Mr. Justice Miller, in *Boyd* v. *United States,* 116 U. S. 616, 638, 641.  Thus, it is unconstitutional to seize a person's private papers, though the search

---

[6] "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."

in which they were recovered was perfectly proper. *E. g.*, *Gouled* v. *United States*, 255 U. S. 298. It is unconstitutional to make an improper search even for articles that are appropriately subject to seizure, *e. g.*, *Amos* v. *United States*, 255 U. S. 313; *Byars* v. *United States*, 273 U. S. 28; *Taylor* v. *United States*, 286 U. S. 1. And a search may be improper because of the object it seeks to uncover, *e. g.*, *Weeks* v. *United States*, 232 U. S. 383, 393–94, or because its scope extends beyond the constitutional bounds, *e. g.*, *Agnello* v. *United States*, 269 U. S. 20.

"The course of decisions here has observed these important distinctions. The Court has not been indulgent towards inroads upon the Amendment. Only rarely have its dicta appeared to give undue scope to the right of search on arrest, and *Marron* v. *United States, supra* [275 U. S. 192], is the only decision in which the dicta were reflected in the result. That case has been a source of confusion to the lower courts. Thus, the Circuit Court of Appeals for the Second Circuit felt that the *Marron* case required it to give a more restricted view to the prohibitions of the Fourth Amendment than that court had expounded in *United States* v. *Kirschenblatt*, 16 F. 2d 202, see *Go-Bart Co.* v. *United States, sub nom., United States* v. *Gowen*, 40 F. 2d 593, only to find itself reversed here, *Go-Bart Co.* v. *United States, supra* [282 U. S. 344], partly on the authority of the *Kirschenblatt* decision which, after the *Marron* case, it thought it must disown. The uncritical application of the right of search on arrest in the *Marron* case has surely been displaced by *Go-Bart Co.* v. *United States, supra,* and even more drastically by *United States* v. *Lefkowitz, supra* [285 U. S. 452], unless one is to infer that an earlier case qualifies later decisions although these later decisions have explicitly confined the earlier case." *Davis* v. *United States*, 328 U. S. at 612–13 (dissenting opinion).

It is urged that even if the search was not justified, once it was made and the illicit documents discovered, they could be seized because their possession was a "continuing offense" committed "in the very presence of the agents." Apparently, then, a search undertaken illegally may retrospectively, by a legal figment, gain legality from what happened four hours later. This is to defeat the prohibition against lawless search and seizure by the application of an inverted notion of trespass *ab initio*. Here an unconstitutional trespass *ab initio* retrospectively acquires legality. Thus, the decision finds satisfaction of the constitutional requirement by circular reasoning. Search requires authority; authority to search is gained by what may be found during search without authority. By this reasoning every illegal search and seizure may be validated if the police find evidence of crime. The result can hardly be to discourage police violation of the constitutional protection.

If the search is illegal when begun, as it clearly was in this case if past decisions mean anything, it cannot retrospectively gain legality. If the search was illegal, the resulting seizure in the course of the search is illegal. It is no answer to say that possession of a document may itself be a crime. There is no suggestion here that the search was based on even a suspicion that Harris was in possession of illicit documents. The search was justified and is justified only in connection with the offense for which there was a warrant of arrest. But unless we are going to throw to the winds the latest unanimous decisions of this Court on the allowable range of search without warrant incidental to lawful arrest, *Go-Bart Co.* v. *United States,* 282 U. S. 344, and *United States* v. *Lefkowitz,* 285 U. S. 452, this was an unlawful search which rendered unavailable as evidence everything seized in the course of it. That the agents might have obtained a warrant to make the search only emphasizes the illegal-

ity of their conduct. In the words of Mr. Justice Holmes, speaking for the Court, the precious constitutional rights "against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way." *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 392. Nor does the fact that the goods seized are contraband make valid an otherwise unlawful search and seizure. *Agnello* v. *United States,* 269 U. S. 20. Indeed it was for contraband goods that search warrants, carefully hedged about, were first authorized by Congress.

The only exceptions to the safeguard of a warrant issued by a magistrate are those which the common law recognized as inherent limitations of the policy which found expression in the Fourth Amendment—where circumstances preclude the obtaining of a warrant (as in the case of movable vehicles), and where the warrant for the arrest of a person carries with it authority to seize all that is on the person, or is in such open and immediate physical relation to him as to be, in a fair sense, a projection of his person. That is the teaching of both the *Go-Bart* and the *Lefkowitz* cases, which effectually retract whatever may have been the loose consideration of the problem in *Marron* v. *United States,* 275 U. S. 192. Thus, the *Go-Bart* case emphasized that the things seized in the *Marron* case were "visible and accessible and in the offender's immediate custody." 282 U. S. 344, 358. By "immediate custody" was not meant that figurative possession which for some legal purposes puts one in "possession" of everything in a house. The sentence following that just quoted excludes precisely the kind of thing that was done here. "There was no threat of force or general search or rummaging of the place." *Ibid.*

In our case, five agents came to arrest Harris on a charge of violating the Postal Laws and the National Stolen Property Act. Though the arrest was consummated in

the living room, the agents were told to make "a thorough search" of the entire apartment. In the bedroom they lifted the carpets, stripped the bed-linen, turned over the mattress. They combed the contents of the linen closet and even looked into Harris' shoes. The Selective Service cards, the items whose seizure is here in controversy, were discovered only after agents tore open a sealed envelope labeled "personal papers" which they had found under some clothes in a drawer of a small bureau in the bedroom. If there was no "rummaging of the place" in this case it would be difficult to imagine what "rummaging of the place" means.

Again, in the *Lefkowitz* case, the *Marron* case was carefully defined and limited:

> "There, prohibition officers lawfully on the premises searching for liquor described in a search warrant, arrested the bartender for crime openly being committed in their presence. He was maintaining a nuisance in violation of the Act. The offense involved the element of continuity, the purchase of liquor from time to time, its sale as a regular thing for consumption upon the premises and other transactions including the keeping of accounts. The ledger and bills being in plain view were picked up by the officers as an incident of the arrest. No search for them was made." 285 U. S. at 465.

Surely no comparable situation is now here. There was no search warrant, no crime was "openly being committed" in the presence of the officers, the seized documents were not "in plain view" or "picked up by the officers as an incident of the arrest." Here a "thorough search" was made, and made without warrant.

To say that the *Go-Bart* and the *Lefkowitz* cases—both of them unanimous decisions of the Court—are authority for the conduct of the arresting agents in this case is to find that situations decisively different are the same.

It greatly underrates the quality of the American people and of the civilized standards to which they can be summoned to suggest that we must conduct our criminal justice on a lower level than does England, and that our police must be given a head which British courts deny theirs. A striking and characteristic example of the solicitous care of English courts concerning the "liberty of the subject" may be found in the recent judgments in *Christie* v. *Leachinsky*. In that case the House of Lords unanimously ruled that if a policeman arrests without warrant, although entertaining a reasonable suspicion of felony which would justify arrest, but does not inform the person of the nature of the charge, the police are liable for false imprisonment for such arrest. These judgments bear mightily upon the central problem of this case, namely, the appropriate balancing, in the words of Lord Simonds, of "the liberty of the subject and the convenience of the police." *Christie* v. *Leachinsky,* [1947] 1 All E. R. 567, 576.[7]

---

[7] The extent to which such subordination of the police to law finds support in informed English opinion is reflected by the comments of the Solicitors' Journal. After noting that, in the view of Lord Simon, "Any other general rule would be contrary to our conception of individual liberty, though it might be tolerated in the time of the *Lettres de Cachet* in the eighteenth century in France or under the Gestapo," the Journal observes: "The importance of the reaffirmation of this principle cannot be exaggerated. The powers of private persons to arrest where a felony has been committed and there is reasonable ground for thinking that the person detained has committed it are important now that crimes of violence are more numerous, and the statutory powers of arrest without warrant under, e. g., the Malicious Damage Act, 1861, the Larceny Act, 1916, the Curtis Act of 1876, and many other Acts are more used than is generally appreciated. Of no less importance in such times as these is the assertion of our individual liberties to counteract any tendency which may appear for police powers to be exceeded." 91 Solicitors' Journal 184–85 (April 12, 1947).

The English attitude was clearly evinced also in the famous *Savidge* case. "Both the original incident and its sequel illustrate the sensitiveness of English opinion to even a suggestion of oppression by the police." IV Reports of the National Commission on Law Observance and Enforcement ("Lawlessness in Law Enforcement") P. 261. For "the high standards of conduct exacted by Englishmen of the police" (*id.* at 259) see the debates in the House of Commons, 217 Hans. Deb. (Commons) cols. 1303 *et seq.* (May 17, 1928), and 220 *id.* cols. 35 and 805 *et seq.* (July 20, 1928) and the Report of the Tribunal of Inquiry on the *Savidge* case, Cmd. 3147, 1928. There are those who say that we cannot have such high standards of criminal justice because the general standards of English life ensure greater obedience to law and better law enforcement. I reject this notion, and not the least because I think it is more accurate to say that the administration of criminal justice is more effective in England because law enforcement is there pursued on a more civilized level.

Of course, this may mean that it might be more difficult to obtain evidence of an offense unexpectedly uncovered in a lawless search. It may even mean that some offenses may go unwhipped of the law. If so, that is part of the cost for the greater gains of the Fourth Amendment. The whole point about the Fourth Amendment is that "Its protection extends to offenders as well as to the law abiding," because of its important bearing in maintaining a free society and avoiding the dangers of a police state. *United States* v. *Lefkowitz, supra* at 464. But the impediments of the Fourth Amendment to effective law enforcement are grossly exaggerated. Disregard of procedures imposed upon the police by the Constitution and the laws is too often justified on the score of necessity. This case is a good illustration how lame an excuse it is that con-

duct such as is now before us is required by the exigencies of law enforcement. Here there was ample opportunity to secure the authority of law to make the search and later authority from a magistrate to seize the articles uncovered in the course of the search. *Taylor* v. *United States,* 286 U. S. 1, 6; *United States* v. *Kaplan,* 89 F. 2d 869, 871. The hindrances that are conjured up are counsels of despair which disregard the experience of effective law enforcement in jurisdictions where the police are held to strict accountability and are forbidden conduct like that here disclosed.

Stooping to questionable methods neither enhances that respect for law which is the most potent element in law enforcement, nor, in the long run, do such methods promote successful prosecution. In this country police testimony is often rejected by juries precisely because of a widely entertained belief that illegal methods are used to secure testimony. Thus, dubious police methods defeat the very ends of justice by which such methods are justified. No such cloud rests on police testimony in England. Respect for law by law officers promotes respect generally, just as lawlessness by law officers sets a contagious and competitive example to others. See IV Reports of the National Commission on Law Enforcement and Observance ("Lawlessness in Law Enforcement") *passim,* especially pp. 190–92. Moreover, by compelling police officers to abstain from improper methods for securing evidence, pressure is exerted upon them to bring the resources of intelligence and imagination into play in the detection and prosecution of crime.

No doubt the Fourth Amendment limits the freedom of the police in bringing criminals to justice. But to allow them the freedom which the Fourth Amendment was designed to curb was deemed too costly by the Founders. As Mr. Justice Holmes said in the *Olmstead* case, "we must consider the two objects of desire,

both of which we cannot have, and make up our minds which to choose." 277 U. S. at 470. Of course arresting officers generally feel irked by what to them are technical legal restrictions. But they must not be allowed to be unmindful of the fact that such restrictions are essential safeguards of a free people. To sanction conduct such as this case reveals is to encourage police intrusions upon privacy, without legal warrant, in situations that go even beyond the facts of the present case. If it be said that an attempt to extend the present case may be curbed in subsequent litigation, it is important to remember that police conduct is not often subjected to judicial scrutiny. Day by day mischief may be done and precedents built up in practice long before the judiciary has an opportunity to intervene. It is for this reason—the dangerous tendency of allowing encroachments on the rights of privacy—that this Court in the *Boyd* case gave to the Fourth Amendment its wide protective scope.

It is vital, no doubt, that criminals should be detected, and that all relevant evidence should be secured and used. On the other hand, it cannot be said too often that what is involved far transcends the fate of some sordid offender. Nothing less is involved than that which makes for an atmosphere of freedom as against a feeling of fear and repression for society as a whole. The dangers are not fanciful. We too readily forget them. Recollection may be refreshed as to the happenings after the first World War by the "Report upon the Illegal Practices of the United States Department of Justice," which aroused the public concern of Chief Justice Hughes [8] (then at the bar), and by the little book entitled "The Deportations De-

---

[8] Address, Harvard Law School Association, June 21, 1920, *Some Observations on Legal Education and Democratic Progress*, p. 23: "We cannot afford to ignore the indications that, perhaps to an extent unparalleled in our history, the essentials of liberty are being disregarded. Very recently information has been laid by responsible citi-

lirium of Nineteen-Twenty" by Louis F. Post, who spoke with the authoritative knowledge of an Assistant Secretary of Labor.

More than twenty years ago, before democracy was subjected to its recent stress and strain, Judge Learned Hand, in a decision approved by this Court in the *Lefkowitz* case, expressed views that seem to me decisive of this case:

> "After arresting a man in his house, to rummage at will among his papers in search of whatever will convict him, appears to us to be indistinguishable from what might be done under a general warrant; indeed, the warrant would give more protection, for presumably it must be issued by a magistrate. True, by hypothesis the power would not exist, if the supposed offender were not found on the premises; but it is small consolation to know that one's papers are safe only so long as one is not at home. Such constitutional limitations arise from grievances, real or fancied, which their makers have suffered, and should go pari passu with the supposed evil. They withstand the winds of logic by the depth and toughness of their roots in the past. Nor should we forget that what seems fair enough against a squalid huckster of bad liquor may take on a very different face, if used by a government determined to suppress political opposition under the guise of sedition." *United States* v. *Kirschenblatt,* 16 F. 2d 202, 203.

[For dissenting opinions of MURPHY and JACKSON, JJ., see *post,* pp. 183, 195.]

---

zens at the bar of public opinion of violations of personal rights which savor of the worst practices of tyranny."

For a contemporaneous judicial account of searches and seizures in violation of the Fourth Amendment in connection with the Communist raids of January 2, 1920, see Judge George W. Anderson's opinion in *Colyer* v. *Skeffington,* 265 F. 17.

APPENDIX

Analysis of Decisions Involving Searches and Seizures, from *Weeks* v. *United States*, 232 U. S. 383, up to *Davis* v. *United States*, 328 U. S. 582*

| 1. Name of case | 2. Charge on arrest | 3. Authority for arrest | 4. Articles seized | 5. Articles seized under warrant | 6. Articles seized incident to lawful arrest | 7. Articles seized incident to authorized search for other articles | 8. Decision |
|---|---|---|---|---|---|---|---|
| *Weeks* v. *United States*, 232 U. S. 383 (1914). | Use of mails to distribute lottery tickets. | Arrested without a warrant and not during commission of crime. | Personal papers and lottery tickets, taken from defendant's home. | None | None | None | District court had improperly admitted in evidence some of articles seized; conviction reversed. |
| *Schenck* v. *United States*, 249 U. S. 47 (1919). | Conspiracy to violate Espionage Act of 1917. | Indictment | Leaflets counseling draft evasion. | Leaflets counseling draft evasion. Warrant was directed to search of Socialist headquarters from which leaflets were mailed by defendant. | do | do | Evidence properly admitted by trial court for use against defendant. |
| *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385 (1920). | Contempt of court for failure to produce books and documents required by subpoena. (One of defendants was a corporation.) Order was based on evidence secured as indicated in columns 3–7. | No arrest | Books and papers seized under color of invalid subpoena. | None | do | do | Order directing production of evidence, which was based on knowledge secured in violation of Fourth Amendment, was error, and conviction for failure to obey order reversed. (White, C. J., and Pitney, J., dissenting.) |
| *Gouled* v. *United States*, 255 U. S. 298 (1921). | Conspiracy and use of mails to defraud United States. | Indictment | Four documents taken from defendant's office. | Three of the papers. (The other was taken by stealth from the office by a government agent.) | do | do | On certification, held that papers were inadmissible. Search warrant may issue only when interest of public or complainant in the article is primary, or when its possession is unlawful; it may not issue merely to secure evidence. |
| *Amos* v. *United States*, 255 U. S. 313 (1921). | Removal of whiskey without payment of tax; sale of whiskey on which no tax had been paid. | do | Whiskey in question, as result of search without a warrant in defendant's absence. (Officers admitted by defendant's wife.) | None | do | do | Evidence improperly admitted; conviction reversed. |
| *Burdeau* v. *McDowell*, 256 U. S. 465 (1921). | Civil suit for return of property in hands of Assistant to Attorney General. | No arrest | Plaintiff's books and papers had been stolen from plaintiff's possession by a party unrelated to the Federal Government. | do | do | do | District court had held that retention of paper for use as evidence was in violation of Fourth and Fifth Amendments; this Court reversed. (Brandeis and Holmes, JJ., dissenting.) |

*For cases related but not immediately pertinent, see *Olmstead* v. *United States*, 277 U. S. 438; *Goldman* v. *United States*, 316 U. S. 129; *United States* v. *White*, 322 U. S. 694; *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186.

| 1. Name of case | 2. Charge on arrest | 3. Authority for arrest | 4. Articles seized | 5. Articles seized under warrant | 6. Articles seized incident to lawful arrest | 7. Articles seized incident to authorized search for other articles | 8. Decision |
|---|---|---|---|---|---|---|---|
| Essgee Co. v. United States, 262 U. S. 151 (1923). | Violation of import laws. (Corporate and individual defendants; only latter, of course, were arrested.) | Warrants | Corporate papers and books | Corporate papers and books produced under subpoena. | None | None | District court admitted evidence against both corporate and individual defendants. This Court affirmed. |
| Carroll v. United States, 267 U. S. 132 (1925). | Transportation of alcoholic beverages. | Arrested during commission of crime. | Alcoholic beverages | None | Whiskey uncovered during search of car in which it was being transported at time of arrest. | do | Evidence was properly admitted; conviction affirmed. (McReynolds and Sutherland, JJ., dissenting.) |
| Steele v. United States, 267 U. S. 498, 505 (1925) (two cases). | 1. Action for return of seized liquor. | 1. No arrest | 1. Liquor | 1. Liquor. (Warrant was directed to address not specifically stated to be that of building searched.) | 1. None | 1. None | 1. Evidence properly secured and need not be returned. |
|  | 2. Possession of liquor in violation of Prohibition Act. | 2. Information | 2. Liquor | 2. Liquor. (Warrant was directed to prohibition officer. Question of reasonable cause for its issuance was not left to jury.) Alcoholic wines. | 2. None | 2. None | 2. Evidence properly secured and properly admitted by district court; judgment affirmed. |
| Dumbra v. United States, 268 U. S. 435 (1925). | Motion to quash search warrant. | No arrest | Alcoholic wines | Alcoholic wines | None | None | Warrant properly issued on reasonable ground; refusal of district court to quash search warrant affirmed. |
| Agnello v. United States, 269 U. S. 20 (1925). | Possession and sale of cocaine without registration or payment of tax. | Arrested during commission of crime. | Can of cocaine seized at home of one of defendants while he was being arrested several blocks away. | None | do | do | Evidence improperly admitted; conviction, affirmed by the C. C. A., here reversed. |
| Byars v. United States, 273 U. S. 28 (1927). | Possession of counterfeit alcoholic beverage stamps. | Indictment | Counterfeit alcoholic beverage stamps. | No Federal warrant issued. But warrant was issued by state judge to state officers to search for liquor. Federal officer accompanied them on search and uncovered stamps. | do | Counterfeit alcoholic beverage stamps. (See column 5.) | Conviction in district court, affirmed in the C. C. A., here reversed, because evidence was improperly admitted. |
| McGuire v. United States, 273 U. S. 95 (1927). | Possession of intoxicating liquor. | Information | Intoxicating liquor | Intoxicating liquor. (Most of liquor thus seized was immediately destroyed, with only samples retained for evidence.) | do | None | On certificate from C. C. A. after conviction, held that evidence was properly admitted. Butler, J., concurring in result. |
| United States v. Lee, 274 U. S. 559 (1927). | Conspiracy to violate Prohibition Act. | Arrested while engaging in crime. | 71 cases of grain alcohol. Cases were seized on American vessel more than 12 miles from shore. | None | 71 cases of grain alcohol | do | Defendant's conviction, reversed by the C. C. A. on grounds of illegal search, sustained by this Court. |

| 1. Name of case | 2. Charge on arrest | 3. Authority for arrest | 4. Articles seized | 5. Articles seized under warrant | 6. Articles seized incident to lawful arrest | 7. Articles seized incident to authorized search for other articles | 8. Decision |
|---|---|---|---|---|---|---|---|
| *Segurola* v. *United States*, 275 U. S. 106 (1927). | Transportation of intoxicating liquor. | Arrested during commission of crime. | Intoxicating liquor_____ | None_____ | The liquor_____ | None_____ | Conviction, affirmed by C. C. A., affirmed by this Court. |
| *United States* v. *Berkeness*, 275 U. S. 149 (1927). | Civil suit to abate nuisance. | No arrest_____ | Liquor_____ | Liquor. Warrant was invalid for failure of allegation of sale on the premises as basis for its issue. | None_____ | _____do_____ | District court judgment excluding evidence, affirmed by C. C. A., affirmed by this Court. |
| *Marron* v. *United States*, 275 U. S. 192 (1927). | Violation of Prohibition Act. | Indictment. (Crime committed in presence of arresting officers. Articles seized, as described in columns 4–7, were taken at time of arrest.) | Intoxicating liquor, ledger, and papers. (Ledger was in closet in back of bar which contained some of the liquor; papers (bills) were on table near cash register.) | The intoxicating liquor_____ | Ledger and bills. Court held that, while seizure was not authorized by the warrant, ledger and bills were properly seized as within the "immediate possession and control" of offender. | See explanation in 282 U. S. at 358, that the articles "were visible and accessible" and that there was no "rummaging of the place." And see 285 U. S. at 465. | Evidence properly admitted; conviction sustained by C. C. A. affirmed here. |
| *Gambino* v. *United States*, 275 U. S. 310 (1927). | Transportation of intoxicating liquor. | Crime committed in presence of arresting officers (state police). | Intoxicating liquor_____ | None_____ | Liquor seized as result of search of car in which defendants were when arrested. But Court found no probable cause for arrest. | None_____ | Evidence improperly admitted; conviction, affirmed by the C. C. A., reversed here. |
| *Go-Bart Co.* v. *United States*, 282 U. S. 344 (1931). | Possession, transportation, sale, etc., of intoxicating liquor. | Invalid warrant_____ | Office papers and records secured by use of keys taken from defendants at time of their arrest, and on false statement that they had a warrant for the papers. | _____do_____ | None. (See column 3.)___ | _____do_____ | Evidence must be returned to defendants; judgments of district court and the C. C. A. reversed. |
| *Husty* v. *United States*, 282 U. S. 694 (1931). | Possession and transportation of intoxicating liquor. | Arrested during commission of crime. | Intoxicating liquor_____ | _____do_____ | Intoxicating liquor uncovered during search of automobile reasonably believed to contain such contraband. | _____do_____ | Movable vehicle authorizes search on probable cause. Evidence properly admitted. |
| *United States* v. *Lefkowitz*, 285 U. S. 452 (1932). | Conspiracy to violate Prohibition Act, including use of premises for sale and solicitation of orders. | Warrant of U. S. Commissioner. | Variety of papers taken from desks, cabinets, and wastebasket. Among these papers were lists of names and addresses, stationery, bills directed to customers, letters of solicitation, etc. | _____do_____ | None. (Papers in wastebasket were, of course, in open view.) | _____do_____ | District court denied motions for return of papers; C. C. A. reversed, and this Court affirmed judgment of C. C. A. |

| 1. Name of case | 2. Charge on arrest | 3. Authority for arrest | 4. Articles seized | 5. Articles seized under warrant | 6. Articles seized incident to lawful arrest | 7. Articles seized incident to authorized search for other articles | 8. Decision |
|---|---|---|---|---|---|---|---|
| *Taylor* v. *United States*, 286 U. S. 1 (1932). | Illegal possession of intoxicating liquor. | Arrest made on basis of evidence uncovered during search. | 122 cases of liquor. Agents investigated and noticed odor of alcohol coming from garage. Defendant had been under suspicion. Agents broke into garage and uncovered cache of liquor. Defendant was arrested when he came to garage during search. | None | None | None | Evidence of seized liquor improperly admitted; conviction and C. C. A. affirmance reversed. |
| *Grau* v. *United States*, 287 U. S. 124 (1932). | Unlawful manufacture and possession of liquor. | Indictment | Still, its appurtenances, and 350 gallons of whiskey. | Still, its appurtenances, and 350 gallons of whiskey. But warrant issued on mere allegations that defendant had been seen hauling cans often used for liquor, and bringing cane sugar onto premises; that full cans were removed from premises; and that odors of fumes of cooking mash were noticeable. There was no allegation of any sale on premises. | do | do | Evidence of seized goods improperly admitted; conviction in trial court and affirmance of C. C. A. reversed. (Stone and Cardozo, JJ., dissenting.) |
| *Sgro* v. *United States*, 287 U. S. 206 (1932). | Possession and sale of intoxicating liquor. | Information | Intoxicating liquor | Intoxicating liquor. But warrant was invalid. When first issued, it was not executed within 10 days; reissued without new evidence or affidavits. | do | do | Evidence of seized liquor improperly admitted; conviction and its affirmance by C. C. A. reversed. (McReynolds, J., concurring in special opinion; Stone and Cardozo, JJ., dissenting.) |
| *Nathanson* v. *United States*, 290 U. S. 41 (1933). | Importation of liquor without payment of import duties. | Information, filed after seizure. | do | Intoxicating liquor. But warrant issued by state judge at request of customs agent on mere allegation of belief by customs agent that defendant had violated the law. | do | do | Evidence of seized liquor improperly admitted; conviction and affirmance by C. C. A. reversed. |
| *Scher* v. *United States*, 305 U. S. 251 (1938). | Possession and transportation of distilled alcohol on which tax had not been paid. | Arrest during commission of crime. | Distilled alcohol on which tax had not been paid. | None | Liquor seized during search of car which officers had followed into garage adjoining defendant's house. | do | Evidence properly admitted; conviction and judgment of C. C. A. affirmed. |

Mr. Justice Murphy, dissenting.

The Court today has resurrected and approved, in effect, the use of the odious general warrant or writ of assistance, presumably outlawed forever from our society by the Fourth Amendment. A warrant of arrest, without more, is now sufficient to justify an unlimited search of a man's home from cellar to garret for evidence of any crime, provided only that he is arrested in his home. Probable cause for the search need not be shown; an oath or affirmation is unnecessary; no description of the place to be searched or the things to be seized need be given; and the magistrate's judgment that these requirements have been satisfied is now dispensed with. In short, all the restrictions put upon the issuance and execution of search warrants by the Fourth Amendment are now dead letters as to those who are arrested in their homes.

That this decision converts a warrant for arrest into a general search warrant lacking all the constitutional safeguards is demonstrated most plainly by the facts. Two valid warrants were issued for the arrest of petitioner and one C. R. Moffett. The first warrant charged them with a violation of the mail fraud statute, § 215 of the Criminal Code; it was alleged that they sent a letter through the mails in connection with the execution of a scheme to defraud by negotiating and cashing a forged check drawn on the Mudge Oil Co. in the sum of $25,000. The second warrant charged that they caused the same check to be transported in interstate commerce in violation of § 3 of the National Stolen Property Act.

Two agents of the Federal Bureau of Investigation went to petitioner's apartment, armed with these warrants for arrest. Petitioner was placed under arrest in the living room of his apartment and was safely handcuffed. The agents, together with three others who had arrived in the meantime, then began a systematic ransacking of the

apartment. Operating without the benefit of a search warrant, they made a search which they admitted was "as thorough as we could make it." For five hours they literally tore the place apart from top to bottom, going through all of petitioner's clothes and personal belongings, looking underneath the carpets, turning the bed upside down, searching through all the bed linen, opening all the chest and bureau drawers, and examining all personal papers and effects. Nothing was left untouched or unopened.

The agents testified that they were searching for "two $10,000 canceled checks of the Mudge Oil Company which our investigation established had been stolen from the offices of the Mudge Oil Company" and which might have been used in connection with forging the $25,000 check in issue. It was also admitted that they were searching "for any means that might have been used to commit these two crimes [charged in the warrants for arrest], such as burglar tools, pens, or anything that could be used in a confidence game of this type"; "we thought we might find a photostatic copy [of the $25,000 check]"; "anything which would indicate a violation of the mail fraud statute and the National Stolen Property Act"; "anything you could find in connection with the violation of the law for which he [petitioner] was then arrested." One of them also admitted that they were "searching for goods, wares, merchandise, articles, or anything in connection with the use of the mails to defraud, and also in connection with the violation of Section 415 of Title 18."

Suffice it to say that they found no checks. The agents admitted seizing seven pens, tissue paper and twenty-seven pieces of celluloid, the latter being found wrapped in a towel in a drawer of the bedroom dresser. Petitioner charges, and it is undenied, that the agents also seized blank stationery of various hotels, blank ruled sheets of paper, several obsolete fountain pens, expense bills and

receipts, personal letters, a bill of sale for petitioner's automobile, note books, address books and some mineral deeds.

Most significant of all, however, was the unexpected discovery and seizure, at the end of this long search, of a sealed envelope marked "George Harris, personal papers." This envelope, which was found in a dresser drawer beneath some clothes, contained eleven draft registration certificates and eight notices of draft classification. Petitioner was then charged with the unlawful possession, concealment and alteration of these certificates and notices and found guilty. Nothing has ever developed as to the forged $25,000 check, which was the basis of petitioner's original arrest. No evidence of the crimes charged in the warrants for arrest has been found; no prosecution of petitioner for those crimes has developed.

It is significant that the crime which was thus unexpectedly discovered—namely, the illegal possession of the draft certificates and notices—could not have been brought to light in this case through the use of ordinary constitutional processes. There was no *prima facie* evidence to support the issuance of a warrant for petitioner's arrest for the crime of possessing these items. Nor was there any probable cause or any basis for an oath or affirmation which could justify a valid search warrant for these items. Their presence in petitioner's apartment could be discovered only by making an unlimited search for anything and everything that might be found, a search of the type that characterizes a general search warrant or writ of assistance. And it was precisely that type of search that took place in this case.

The Court holds, however, that the search was justified as an incident to petitioner's lawful arrest on the mail fraud and stolen property charges. It is said that law enforcement officers have the right, when making a valid arrest, to search the place and to seize the fruits and in-

strumentalities of the crime for which the arrest was made. And since the search here was made, at least in part, to find the instrumentalities of the alleged crimes, the search was valid and petitioner cannot be heard to complain of what was found during the course of that search. This conclusion bears further analysis, however.

It is undoubtedly true that limited seizures may be made without the benefit of search warrants under certain circumstances where a person has been arrested in his home. Due accommodation must be made for the necessary processes of law enforcement. Seizure may be made of articles and papers on the person of the one arrested. And the arresting officer is free to look around and seize those fruits and evidences of crime which are in plain sight and in his immediate and discernible presence. *Weeks* v. *United States,* 232 U. S. 383, 392; *Agnello* v. *United States,* 269 U. S. 20, 30. But where no properly limited search warrant has been issued, this Court has been scrupulously insistent on confining very narrowly the scope of search and seizure. The mere fact that a man has been validly arrested does not give the arresting officers untrammeled freedom to search every cranny and nook for anything that might have some relation to the alleged crime or, indeed, to any crime whatsoever. Authority to arrest, in other words, gives no authority whatever to search the premises where the arrest occurs and no authority to seize except under the most restricted circumstances.

Illustrative of the strict limitations which this Court has placed upon searches and seizures without a warrant in connection with a lawful arrest are the three cases of *Marron* v. *United States,* 275 U. S. 192; *Go-Bart Co.* v. *United States,* 282 U. S. 344, and *United States* v. *Lefkowitz,* 285 U. S. 452. In the *Marron* case, an individual was arrested while actually engaged in running an illegal saloon in pursuance of a conspiracy; a prohibition agent secured a warrant for a search of the premises and for the

seizure of intoxicating liquors and articles for their manu-
facture. Liquor was found in a closet. While searching
in the closet, the agents noticed a ledger showing inven-
tories of liquor and receipts relating to the business.
Alongside the cash register they found bills for utilities
furnished to the premises. They took the ledger and the
bills. This Court held that while the seizure of the ledger
and bills could not be justified under the search warrant,
because not mentioned therein, their seizure was proper as
an incident to the arrest inasmuch as they were necessary
to the carrying on of the illegal business.

The *Marron* case at first was widely misunderstood as
having held that most of the restrictions had been removed
on searches of premises incident to arrests. *United States*
v. *Gowen,* 40 F. 2d 593; *United States* v. *Poller,* 43 F. 2d
911. This misunderstanding was removed by the *Go-Bart*
case, which made it clear that the items seized in the *Mar-
ron* case were visible and accessible and in the offender's
immediate custody; it was further pointed out that there
was no threat of force or general search or rummaging of
the place in the *Marron* case. The inherent limitations
of the *Marron* holding were demonstrated by the facts and
decision in the *Go-Bart* case. There the defendant
Bartels was placed under lawful arrest in his office on a
charge of conspiracy to sell intoxicating liquors. Gowen,
the other defendant, arrived and he also was placed under
lawful arrest. Gowen was then forced to open a desk and
a safe, which were searched by the agents along with other
parts of the office. A large quantity of papers belonging
to the defendants was seized. This Court held that such
a seizure was unconstitutional, the search being general
and unlimited in scope and being undertaken in the hope
that evidence of the crime might be found.

In the *Lefkowitz* case, the defendants were placed under
lawful arrest in their office on a charge of conspiracy to
violate the liquor laws. The arresting officers then pro-

ceeded to search the desks, the towel cabinet and the waste baskets, seizing various books, papers and other articles. All of this was done without a search warrant. Once again the Court held that the Constitution had been violated. It was pointed out that the searches were exploratory and general and made solely to find evidence of the defendant's guilt of the alleged conspiracy or some other crime; the papers and other articles seized were unoffending in themselves.

Tested in the light of the foregoing principles and decisions, the search in the instant case cannot be justified. Even more glaring than the searches in the *Go-Bart* and *Lefkowitz* cases, the search here was a general exploratory one undertaken in the hope that evidence of some crime might be uncovered. The agents were searching for more than the fruits and instrumentalities of the crimes for which the arrest was made. By their own repeated testimony, they were searching for "anything" in connection with the alleged crimes, for "anything" that would indicate a violation of the laws in question. And their seizure of the draft certificates and notices demonstrates that they were also on the lookout for evidence of any other crime. In the absence of a valid warrant, such an unlimited, ransacking search for "anything" that might turn up has been condemned by this Court in constitutional terms time and time again. Nothing in any of the previous decisions of this Court even remotely approves or justifies this type of search as an incident to a valid arrest; in this respect, today's decision flatly contradicts and, in effect, overrules the *Go-Bart* and *Lefkowitz* cases.

Moreover, even if we assume that the agents were merely looking for the fruits and instrumentalities of the crimes for which the arrest was made, the Constitution has been violated. There are often minute objects connected with the commission of a crime, objects that can

be hidden in a small recess of a home or apartment and that can be discovered only by a thorough, ransacking search. Where the discovery of such objects requires an invasion of privacy to the extent evident in this case, the dangers inherent in such an invasion without a warrant far outweigh any policy underlying this method of crime detection. A search of that scope inevitably becomes, as it has in this case, a general exploratory search for "anything" in connection with the alleged crime or any other crime—a type of search which is most roundly condemned by the Constitution.

Thus when a search of this nature degenerates into a general exploratory crusade, probing for anything and everything that might evidence the commission of a crime, the Constitution steps into the picture to protect the individual. If it becomes evident that nothing can be found without a meticulous uprooting of a man's home, it is time for the law enforcement officers to secure a warrant. And if such a search has any reasonableness at all, it is a reasonableness that must be determined through the informed and deliberate judgment of a magistrate. "Security against unlawful searches is more likely to be attained by resort to search warrants than by reliance upon the caution and sagacity of petty officers while acting under the excitement that attends the capture of persons accused of crime." *United States* v. *Lefkowitz, supra,* 464.

To insist upon a search warrant in the circumstances of this case is not to hobble the law enforcement process. Here there was no necessity for haste, no likelihood that the contents of the apartment might be removed or destroyed before a valid search warrant could be obtained. Indeed, the agents did get a warrant to search petitioner's office and automobile. It would have been no undue burden on them to obtain a warrant to search the apartment,

guarding it in the meantime. Certainly the Constitution is not dependent upon the whim or convenience of law enforcement officers. Search should not be made without a warrant, in other words, where the opportunity for the issuance of a warrant exists. *Carroll* v. *United States,* 267 U. S. 132, 156; *Taylor* v. *United States,* 286 U. S. 1, 6.

The decision of the Court in this case can have but one meaning so far as searches are concerned. It effectively takes away the protection of the Fourth Amendment against unreasonable searches from those who are placed under lawful arrest in their homes. Small, minute objects are used in connection with most if not all crimes; and there is always the possibility that some fruit of the crime or some item used in the commission of the offense may take the form of a small piece of paper. Using the subterfuge of searching for such fruits and instrumentalities of the crime, law enforcement officers are now free to engage in an unlimited plunder of the home. Some of them may be frank enough, as in this case, to admit openly that the object of their search is "anything" that might connect the accused with the alleged crime. Others may be more guarded in their admissions. But all will realize that it is now far better for them to forego securing a search warrant, which is limited in scope by the Fourth Amendment to those articles set forth with particularity in the warrant. Under today's decision, a warrant of arrest for a particular crime authorizes an unlimited search of one's home from cellar to attic for evidence of "anything" that might come to light, whether bearing on the crime charged or any other crime. A search warrant is not only unnecessary; it is a hindrance.

The holding that the search in this case was proper and reasonable thus expands the narrow limitations on searches incident to valid arrests beyond all recognition.

What has heretofore been a carefully circumscribed exception to the prohibition against searches without warrants has now been inflated into a comprehensive principle of freedom from all the requirements of the Fourth Amendment. The result is that a warrant for arrest is the equivalent of a general search warrant or writ of assistance; as an "incident" to the arrest, the arresting officers can search the surrounding premises without limitation for the fruits, instrumentalities and anything else connected with the crime charged or with any other possible crime. They may disregard with impunity all the historic principles underlying the Fourth Amendment relative to indiscriminate searches of a man's home when he is placed under arrest. See *Boyd* v. *United States,* 116 U. S. 616, 624–632; *Weeks* v. *United States, supra; Byars* v. *United States,* 273 U. S. 28. They may disregard the fact that the Fourth Amendment was designed in part, indeed perhaps primarily, to outlaw such general warrants, that there is no exception in favor of general searches in the course of executing a lawful warrant for arrest. As to those placed under arrest, the restrictions of the Fourth Amendment on searches are now words without meaning or effect.

Nor is the flagrant violation of the Fourth Amendment in this case remedied by the fact that the arresting officers, during the course of their ransacking search, uncovered and seized certain articles which it was unlawful for petitioner to possess. It has long been recognized, of course, that certain objects, the possession of which is in some way illegal, may be seized on appropriate occasions without a search warrant. Such objects include stolen goods, property forfeited to the Government, property concealed to avoid payment of duties, counterfeit coins, burglar tools, gambling paraphernalia, illicit liquor and the like. *Boyd* v. *United States, supra,* 623–624;

*United States* v. *Lefkowitz, supra,* 465–466; *Gouled* v. *United States,* 255 U. S. 298, 309. But the permissible seizure of such goods is necessarily dependent upon the seizure occurring (1) during the course of a reasonable, constitutional search, (2) as the result of ready observance of the surrounding premises by the arresting officers, or (3) as the result of the use of such objects in the commission of a crime in the presence of the officers. Never has it been suggested by this Court that law enforcement officers can use illegal means to seize that which it is unlawful to possess. To break and enter, to engage in unauthorized and unreasonable searches, to destroy all the rights to privacy in an effort to uproot crime may suit the purposes of despotic power, but those methods cannot abide the pure atmosphere of a free society.

The seizure here, as noted, did not occur during the course of a reasonable, constitutional search. Nor did it result from the ready observance of the surrounding premises; the draft certificates and notices were discovered only after a most meticulous ransacking. It is said, however, that the possession of these items by petitioner constituted a continuing offense committed in the presence of the arresting officers. This may be a dialectical way of putting the matter, but it would not commend itself to the common understanding of men. From a practical standpoint, these certificates and notices were not being possessed in the presence of the officers. They were hidden away in the bottom of a dresser drawer beneath some clothes. No arresting officer could possibly be aware of their existence or location unless he possessed some supernatural faculty. Indeed, if an arresting officer is to be allowed to search for and seize all hidden things the possession of which is unlawful, on the theory that the possession is occurring in his presence, there would be nothing

left of the Fourth Amendment. Law enforcement officers would be invited to ignore the right to privacy executing warrants of arrest and searching without restraint and without regard to constitutional rights for those hidden items which were being illegally "possessed" in their "presence."

The key fact of this case is that the search was lawless. A lawless search cannot give rise to a lawful seizure, even of contraband goods. And "good faith" on the part of the arresting officers cannot justify a lawless search, nor support a lawless seizure. In forbidding unreasonable searches and seizures, the Constitution made certain procedural requirements indispensable for lawful searches and seizures. It did not mean, however, to substitute the good intentions of the police for judicial authorization except in narrowly confined situations. History, both before and after the adoption of the Fourth Amendment, has shown good police intentions to be inadequate safeguards for the precious rights of man. But the Court now turns its back on that history and leaves the reasonableness of searches and seizures without warrants to the unreliable judgment of the arresting officers. As a result, the rights of those placed under arrest to be free from unreasonable searches and seizures are precarious to the extreme.

Now it may be that the illegality of the search and of the seizure in this case leads to the immunizing of petitioner from prosecution for the illegal possession of the draft certificates and notices. But freedom from unreasonable search and seizure is one of the cardinal rights of free men under our Constitution. That freedom belongs to all men, including those who may be guilty of some crime. The public policy underlying the constitutional guarantee of that freedom is so great as to outweigh the desirability of convicting those whose crime has been revealed through an unlawful invasion of their

right to privacy. Lawless methods of law enforcement are frequently effective in uncovering crime, especially where tyranny reigns, but they are not to be countenanced under our form of government. It is not a novel principle of our constitutional system that a few criminals should go free rather than that the freedom and liberty of all citizens be jeopardized.

It is likely that the full impact of today's decision will not be apparent immediately. Petitioner is not an important or notorious criminal; and the investigation may have been undertaken with the best of motives. But apart from the fact that the Constitution was designed to protect the unimportant as well as the important, including those of criminal tendencies, the implications of what has been done in this case can affect the freedom of all our people. The principle established by the Court today can be used as easily by some future government determined to suppress political opposition under the guise of sedition as it can be used by a government determined to undo forgers and defrauders. See *United States* v. *Kirschenblatt,* 16 F. 2d 202, 203. History is not without examples of the outlawry of certain political, religious and economic beliefs and the relentless prosecution of those who dare to entertain such beliefs. And history has a way of repeating itself. It therefore takes no stretch of the imagination to picture law enforcement officers arresting those accused of believing, writing or speaking that which is proscribed, accompanied by a thorough ransacking of their homes as an "incident" to the arrest in an effort to uncover "anything" of a seditious nature. Under the Court's decision, the Fourth Amendment no longer stands as a bar to such tyranny and oppression. On the contrary, direct encouragement is given to this abandonment of the right of privacy, a right won at so great a cost by

those who fought for freedom through the flight of time.

As Judge Learned Hand recently said, "If the prosecution of crime is to be conducted with so little regard for that protection which centuries of English law have given to the individual, we are indeed at the dawn of a new era; and much that we have deemed vital to our liberties, is a delusion." *United States* v. *Di Re,* 159 F. 2d 818, 820.

MR. JUSTICE FRANKFURTER and MR. JUSTICE RUTLEDGE join this dissent.

MR. JUSTICE JACKSON, dissenting.

This case calls upon the Court to say whether any right to search a home is conferred on officers by the fact that within that home they arrest one of its inhabitants. The law in this field has not been made too clear by our previous decisions. I do not criticize the officers involved in this case, because this Court's decisions afford them no clear guidance.

The Fourth Amendment first declares in bold broad terms: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Our trouble arises because this sentence leaves debatable what particular searches are unreasonable ones. Those who think it their duty to make searches seldom agree on this point with those who find it in their interest to frustrate searches.

The Amendment, having thus roughly indicated the immunity of the citizen which must not be violated, goes on to recite how officers may be authorized, consistently with the right so declared, to make searches: ". . . and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing

the place to be searched, and the persons or things to be seized."

Here endeth the command of the forefathers, apparently because they believed that by thus controlling search warrants they had controlled searches. The forefathers, however, were guilty of a serious oversight if they left open another way by which searches legally may be made without a search warrant and with none of the safeguards that would surround the issuance of one.

Of course, a warrant to take a person into custody is authority for taking into custody all that is found upon his person or in his hands. Some opinions have spoken in generalities of this right to search such property incidentally to arrest of the person as including whatever was in the arrested person's "possession."

Repeated efforts have been made to expand this search to include all premises and property in constructive possession by reason of tenancy or ownership. While the language of this Court sometimes has been ambiguous, I do not find that the Court heretofore has sustained this extension of the incidental search. *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344; *United States* v. *Lefkowitz,* 285 U. S. 452. In this respect, it seems to me, the decision of today goes beyond any previous one and throws a home open to search on a warrant that does not in any respect comply with the constitutional requirements of a search warrant and does not even purport to authorize any search of any premises.

The decision certainly will be taken, in practice, as authority for a search of any home, office or other premises if a warrant can be obtained for the arrest of any occupant and the officer chooses to make the arrest on the premises. It would seem also to permit such search incidentally to an arrest without a warrant if the circumstances make such arrest a lawful one. It would also appear to sanc-

tion a search of premises even though the arrest were for the most petty of misdemeanors. It leaves to the arresting officer choice of the premises to be searched insofar as he can select the place among those in which the accused might be found where he will execute the warrant of personal arrest. Thus, the premises to be searched are determined by an officer rather than by a magistrate, and the search is not confined to places or for things "particularly described" in a warrant but, in practice, will be as extensive as the zeal of the arresting officer in the excitement of the chase suggests. Words of caution will hedge an opinion, but they are not very effective in hedging searches.

The difficulty with this problem for me is that once the search is allowed to go beyond the person arrested and the objects upon him or in his immediate physical control, I see no practical limit short of that set in the opinion of the Court—and that means to me no limit at all.

I am unable to suggest any test by which an incidental search, if permissible at all, can in police practice be kept within bounds that are reasonable. I hear none. I do not agree with other Justices in dissent that the intensity of this search made it illegal. It is objected that these searchers went through everything in the premises. But is a search valid if superficial and illegal only if it is thorough? It took five hours on the part of several officers. But if it was authorized at all, it can hardly become at some moment illegal because there was so much stuff to examine that it took overtime. It is said this search went beyond what was in "plain sight." It would seem a little capricious to say that a gun on top of a newspaper could be taken but a newspaper on top of a gun insulated it from seizure. If it were wrong to open a sealed envelope in this case, would it have been right if the mucilage failed to stick? The short of the thing is that we cannot say

that a search is illegal or legal because of what it ends in. It is legal or illegal because of the conditions in which it starts.

I cannot escape the conclusion that a search, for which we can assign no practicable limits, on premises and for things which no one describes in advance, is such a search as the Constitution considered "unreasonable" and intended to prohibit.

In view of the long history of abuse of search and seizure which led to the Fourth Amendment, I do not think it was intended to leave open an easy way to circumvent the protection it extended to the privacy of individual life. In view of the readiness of zealots to ride roughshod over claims of privacy for any ends that impress them as socially desirable, we should not make inroads on the rights protected by this Amendment. The fair implication of the Constitution is that no search of premises, as such, is reasonable except the cause for it be approved and the limits of it fixed and the scope of it particularly defined by a disinterested magistrate. If these conditions are necessary limitations on a court's power expressly to authorize a search, it would seem that they should not be entirely dispensed with because a magistrate has issued a warrant which contains no express authorization to search at all.

Of course, this, like each of our constitutional guaranties, often may afford a shelter for criminals. But the forefathers thought this was not too great a price to pay for that decent privacy of home, papers and effects which is indispensable to individual dignity and self-respect. They may have overvalued privacy, but I am not disposed to set their command at naught.