UNITED STATES v. CHRISTAKOS.

UNITED STATES v. WOOLARD.

Nos. 11660–11662, 11664–11668.

United States District Court
N. D. Alabama, S. D.
April 6, 1949.

John D. Hill, U. S. Atty. and R. Macey Taylor, Asst. U. S. Atty., both of Birmingham, Ala., for the United States.

John S. Foster, of Birmingham, Ala., for Christakos.

Charles L. Howard, Jr., of Birmingham, Ala., for Woolard.

LYNNE, District Judge.

The several motions of Christakos and Woolard to vacate sentences imposed upon them by Honorable Clarence Mullins, Senior District Judge of this Court, on April 20, 1945, were assigned to me for full hearings thereon by the same order in which Judge Mullins recused himself on the ground that he had previously testified against the contentions of Christakos in a habeas corpus proceeding.[1]

By appointment of the Court, able and industrious counsel agreed to and capably did represent the movants. They were brought to Birmingham for conferences with their attorneys at the time suggested by the latter. The processes of the Court were freely extended to them to enable them to obtain relevant evidence and to summon material witnesses at the expense of the Government.

For obvious reasons, the two motions were consolidated for hearing. While Christakos assigns eight grounds to his

---

[1] Christakos v. Hunter, Warden, 10 Cir., 161 F.2d 692.

motion[2] and Woolard three,[3] this opinion will be confined to consideration of whether each movant competently, intelligently, and with full understanding of the implications, waived his constitutional right to counsel at the time of his arraignment, plea and sentence.

To digress, brief notice should be taken of the point raised by Woolard that an official court reporter was not present at the arraignment as required by law. The short answer to this contention is that there was no official court reporter on the date of arraignment. A court reporter was not appointed for this Court until June 18, 1945, to become effective July 1, 1945. Moreover, the appropriation for the payment of salaries to court reporters was not finally enacted until May 21, 1945.[4]

It would unduly extend this opinion to attempt a definitive analysis of the right to counsel in criminal prosecutions guaranteed by either the Sixth or Fourteenth Amendments.[5] Since Johnson v. Zerbst[6] was decided, no one doubts that the Sixth Amendment unequivocally guarantees to an indigent accused the right to assistance of counsel for his defense in all criminal prosecutions in the Federal courts.

The Advisory Committee appointed by the Supreme Court to assist in the preparation of rules of pleading, practice and procedure in criminal cases in district courts of the United States was confronted with the task of meeting the requirements of the Sixth Amendment as construed in Johnson v. Zerbst. The rule which finally

---

2 (1) The Court had no jurisdiction because at the time the plea was entered and sentence was imposed, Christakos was an escapee from a military prison and at the time he was apprehended by the civil authorities he was a general military prisoner.

(2) Ground No. 2 attacked the validity of the indictment in case No. 11,667 in that Christakos contends that the charge described in this indictment (embezzlement and conversion of property issued for the military service) does not state an offense against a member of the U. S. Army.

(3) Ground No. 3 is apparently another attack on the validity of the indictment in case No. 11,667 in that Christakos contends that the indictment erroneously joins offenses which joiner constitutes a felony, whereas, if he had been charged with each separate offense joined therein his separate and several crimes would have been a misdemeanor.

(4) As ground No. 4 Christakos attacked the validity of the indictment in case No. 11,664 (impersonation of Government officer) as not stating a cause of action and alleges, in addition, that any sentence thereunder is void due to the fact that he was also sentenced in an identical case, No. 11,660, which charges a violation of Title 10, U.S.C.A. § 1393, for illegal wearing of the uniform.

(5) Christakos in ground No. 5 attacked the validity of the indictment in case No. 11,665 which charged a violation of the Dyer Act because of the fact that the same offense was included in case No. 11,668. Case No. 11,668 was nol prossed at the time of arraignment on the other cases.

(6) As ground No. 6 Christakos alleges that he was not informed of the charges pending against him in cases No. 11,664, No. 11,665, and No. 11,667 before entering his plea thereto.

(7) Ground No. 7 is an allegation that his plea of guilty in case No. 11,664, No. 11,665 and No. 11,667 was procured by collusion and fraud.

(8) Here Christakos attacked the validity of all indictments on which he was sentenced on the ground that women were systematically excluded from the grand jury which rendered the indictments. His theory for this ground is that since he is a citizen of Illinois and since the State of Illinois permits women to serve on grand juries, the exclusion of women from Federal grand juries in Alabama rendered any indictment returned invalid.

3 (1) No intelligent waiver of counsel.
(2) Lack of sufficient understanding of the offenses pending against him before his plea of guilty was entered thereto.

(3) The Court did not have jurisdiction to impose sentence because a court reporter was not present, as required by Title 28 U.S.C.A. § 9a [now § 753].

4 The Judiciary Appropriation Act, 1946, Chapter 129, 59 Stat. 199.

5 In an article entitled "The Right of Counsel under the Sixth Amendment," by Honorable Alexander Holtzoff, 28 New York University Law Quarterly, page 1, the author reviews the right from its inception in our jurisprudence to 1944. See also Comprehensive Annotation, 3 A.L.R.2d 1003.

6 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357.

emerged from the deliberations of the Committee and which was, among others, prescribed by the Supreme Court pursuant to the Act of June 29, 1940, Chap. 445, 54 Stat. 688, is Rule 44, Federal Rules of Criminal Procedure, 18 U.S.C.A. § 3771.[7]

▮▮ Thereby the district judge is instructed, on the one hand, to advise the accused who appears before him, unaccompanied by an attorney, of his right to counsel and to assign counsel to represent him at every stage of the proceedings and, on the other, to respect his election to proceed without counsel. It has never been supposed that the Constitution required that the services of an attorney be thrust upon an indigent but otherwise competent defendant.[8] On the contrary, it is recognized that "he may waive his Constitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes open."[9]

The evolution of these sound concepts of criminal procedure, which rightfully emphasized the dignity of the individual and his traditional freedom under constitutional government, provoked no concern among the busy trial judges in the Federal system. It may not be an overstatement to observe that with practical unanimity they have sought conscientiously to observe not only the letter but also the spirit of these decisions before approving the waiver of counsel by accused. It would be abhorrent to reason to assume that the high and solemn duties of his position rest lightly on any member of our judiciary.[10]

We had assumed that the test of the validity of a waiver of counsel was largely subjective. But one of the opinions in Von Moltke v. Gillies[11] suggests that in

7 "If the defendant appears in court without counsel, the court shall advise him of his right to counsel and assign counsel to represent him at every stage of the proceeding unless he elects to proceed without counsel or is able to obtain counsel."

8 Carter v. People of State of Illinois, 329 U.S. 173, 67 S.Ct. 216, 91 L.Ed. 172.

9 Quoted from the opinion of the Court in Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268, 143 A.L.R. 435, the context of which follows: "The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms. They rest on considerations that go to the substance of an accused's position before the law. The public conscience must be satisfied that fairness dominates the administration of justice. An accused must have the means of presenting his best defense. He must have time and facilities for investigation and for the production of evidence. But evidence and truth are of no avail unless they can be adequately presented. Essential fairness is lacking if an accused cannot put his case effectively in court. But the Constitution does not force a lawyer upon a defendant. He may waive his Constitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes open."

10 The following remarks of Chief Justice Marshall (Debates, Virginia Convention, 1829–1831, pages 616, 619) are all but sacred:

"Advert, Sir, to the duties of a Judge. He has to pass between the Government and the man whom that Government is prosecuting: between the most powerful individual in the community, and the poorest and most unpopular. It is of the last importance, that in the exercise of these duties, he should observe the utmost fairness. Need I press the necessity of this? Does not every man feel that his own personal security and the security of his property depends on that fairness? The Judicial Department comes home in its effects to every man's fireside: it passes on his property, his reputation, his life, his all. Is it not, to the last degree important, that he should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience? * * * I have always thought, from my earliest youth till now, that the greatest scourge an angry Heaven ever inflicted upon an ungrateful and a sinning people, was an ignorant, a corrupt, or a dependent Judiciary."

11 332 U.S. 708, 723, 68 S.Ct. 316, 323. The language of the opinion in pertinent part follows: "To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must

every case it is the responsibility of the judge, before approving a waiver of counsel, to advise the accused: (1) of the nature of the charges; (2) of the statutory offenses included within them; (3) of the range of allowable punishments thereunder; (4) of possible defenses to the charges and circumstances in mitigation thereof, and (5) of all other facts essential to a broad understanding of the whole matter.

Against the factual background of the case in which that opinion was written, it was my conviction that it was never intended to prescribe a test of unvarying application. Baldly stated, if it were, it was virtually a command to trial judges to assume the role of counsel to an accused who had expressed an election not to have counsel assigned to him by the court. But new doubts have been stirred by the concluding language of the opinion of the Court in Uveges v. Commonwealth of Pennsylvania.[12] There, by clear implication, is a plain direction to the trial judge conscientiously to undertake to perform the functions ordinarily entrusted to counsel, when the accused expresses a desire to dispense with a lawyer's help.

If the Supreme Court should eventually hold expressly that a defendant cannot waive his right to counsel without the advice of counsel, I would, of course, acquiesce in all humility. But, first, I would protest. Surely judges did not win their freedom from the crown[13] only to lose it to those who set themselves against the sovereign.

██ There is something essentially incongruous in a judge's arrogation of the office of an attorney in relation to an accused. He is not entitled to information relating to the social and economic background of a defendant, including his prior criminal record, if any, as disclosed by the report of presentence investigation, until after a plea of guilty has been received.[14] It is fair to assume that this safeguard was inserted in the criminal rules to insure the fact, as well as the appearance, that the judge is an arbiter and not an arm of the prosecution.

For a judge to explore intelligently "possible defenses to the charges" pending against an accused and "circumstances in mitigation thereof," a conference between judge and defendant would be indispensable and an independent, time consuming investigation, as broad and searching as the facts developed in the conference might suggest, would be a virtual necessity. Serious objections, both pragmatic and dogmatic, to such an innovation in historic criminal procedure occur to me. Objections in the former category are readily apparent and require no elucidation.

Any conference between judge and prisoner would involve imponderable psychological factors. An explanation of the defendant's privilege against self-incrimination[15] in one breath might easily be nulli-

---

be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered."

12 335 U.S. 437, 442, 69 S.Ct. 184, 186: "Whatever our decision might have been if the trial court had informed him of his rights and conscientiously had undertaken to perform the functions ordinarily entrusted to counsel, we conclude that the opportunity to have counsel in this case was a necessary element of a fair hearing." It is significant that Mr. Justice Reed, who joined the dissent in Von Moltke v. Gillies, delivered the opinion of the court.

13 See "A History of English Law," W. S. Holdsworth, Vol. II, p. 556, et seq.

14 Rule 32(c) (1), Federal Rules of Criminal Procedure: "The probation service of the court shall make a presentence investigation and report to the court before the imposition of sentence or the granting of probation unless the court otherwise directs. The report shall not be submitted to the court or its contents disclosed to anyone unless the defendant has pleaded guilty or has been found guilty."

15 The pertinent provision of the Fifth Amendment is: " * * * nor shall be compelled in any criminal case to be a witness against himself, * * *."

fied in the next by the judge's simple statement that he must know the truth of the facts out of which possible defenses might arise. The range of defenses to criminal accusations is wide. An academic exposition of all possible defenses to any given criminal charge, which ignores the facts, could be of no conceivable benefit to a man faced with the imminent loss of his liberty, nor would his reaction to such advice aid the trial court in determining whether his "professed waiver of counsel" was "understandingly and wisely made."

As I see it, there would be inherent danger in the practice by trial judges of inviting defendants to make a full disclosure of the facts relating to the charge against him. The evils of the judicial inquisition were none the less real because they are now shrouded in the mists of antiquity.[16] Moreover, the disclosures, in the nature of admissions and confessions made by the accused in conference with the judge, are protected by a specific independent privilege which only the judge

may claim, while those made in confidence to his attorney are privileged at his own election.[17]

█ Turning to the facts developed upon a full hearing on these motions, it is at once apparent that if the "judge as lawyer" test, discussed in the Von Moltke and Uveges cases, supra, were applied to the action of the trial court in approving waivers of counsel by the movants and in receiving their several pleas of guilty, the motions should be granted. But I am persuaded that the attendant facts and circumstances found by the Court[18] invoke the "eyes open" test laid down in the McCann case, supra. To this extent the bare allegations of the respective petitions, unsupported by credible testimony, are disregarded.

Judge Mullins, called as a witness by the Court, testified clearly and explicitly to the circumstances surrounding the arraignment of each movant on each indictment pending against him.[19] I would be

[16] For articulate appreciation of the threat to the privilege against self-incrimination involved in magisterial inquiries, see the opinion of Mr. Justice Rutledge, then Circuit Judge, in Wood v. United States, 75 U.S.App.D.C. 274, 128 F.2d 265, 141 A.L.R. 1318.

[17] The privilege of communication between attorney and client is the oldest of the privileges for confidential communications, and in the course of its expansion it became well settled that communications made in confidence by the client to his attorney are at his instance permanently protected from disclosure by himself or by his attorney except the protection be waived. Wigmore on Evidence, 3rd Ed., Vol. VIII, Sec. 2290 et seq.

A consultation with a judge in his capacity as such falls unquestionably outside the present privilege. But such communications may be protected by a specific independent privilege. Wigmore on Evidence, 3rd Ed., Vol. VIII, Sec. 2300.

A judge of any court who, as such, receives information upon a matter, criminal or civil, from a person, whether party or not, confessing his own offense or liability, is privileged to withhold testimony to such information, if received in confidence, when called as a witness in any proceeding not tried before himself. Whether a judge should in a given

case with propriety receive such information at all or receive it with a pledge of confidence, is a matter of judicial ethics; but when once received, the privilege applies. Wigmore on Evidence, 3rd Ed., Vol. VIII, Sec. 2376.

[18] See separate "Findings of Fact" made and filed by the Court as to each movant.

[19] The clarity of Judge Mullins' recollection of the events which transpired on the arraignments of each accused and his conscientious efforts to protect them in the exercise or waiver of their constitutional rights is illustrated by the following fragmentary excerpts from his testimony:

"* * * I explained in a general way the charges against him that were contained in the various indictments against him. I either asked him if he was able to hire counsel and he replied that he was not, or I assumed that he was not able to hire counsel due to the fact that he was in custody. I do not recall which. At any rate I advised him at that time that it was the duty of the Court to appoint counsel to represent him in the case if he wanted counsel, and my best recollection is that I told him that I would appoint counsel to represent him or an attorney to represent him, who would represent him free of charge, that he would be under no obligation to pay the attorney

less than human if I should ignore my own impressions of him in his role as jurist, gleaned from my intimate association with him, in passing upon the credibility of his testimony, which, in factual content, permissible inferences and subtle nuances, is directly at variance with that of each movant.

It is sufficient to state that the responsibilities of his office rest heavily upon him. In word and act he has exhibited singular fidelity to the highest and best traditions of the judiciary. It may truly be said of him, as it was once said of Lord Bacon, that he has "labored painfully" to discharge properly his duties as a judge. In his persistent efforts to accomplish even-handed justice in cases before him he has striven conscientiously "to draw his learning from his books and not from his head" and has remained blind alike to race, color, wealth and poverty. His statement that "they impressed me that they knew what they were doing," referring to the movants' professed waiver of counsel and their subsequent pleas of guilty, is not to be taken lightly. That Judge Mullins sincerely believed that they had their "eyes open" in these matters, satisfies me and nothing that

was said subsequently, which was necessary to a decision of the Von Moltke and Uveges cases, supra, inveighs against my conclusion that neither movant was deprived, through accident or design, of a constitutional right on his arraignment.

On February 2, 1945, prior to their arraignment on April 20, 1945, each movant voluntarily signed a written statement.[20] Such statements contained full and clear confessions of their guilt of the offenses charged in the indictments, upon which they were arraigned. Moreover, they recited facts which concluded that each of them was in the status of escape from the service of a sentence imposed by a General Court-Martial of the Army[21] and that in the course of their flight from confinement at the hands of the military authorities they committed at least three offenses for which, upon conviction, the death penalty would have been warranted, but as to which no charges have been preferred, in so far as I am advised.

The foregoing references to other and independent heinous crimes are included in this opinion not to negate their rights to the protection of the Constitution[22] but as demonstrative of the state

---

anything for representing him in the case."

"Q. Was it also your judgment and opinion at that time from the appearance and demeanor, the apparent intelligence and bearing of each petitioner, that he understood the nature of the charges against him? A. That is my judgment and my best recollection, is that after the District Attorney had explained the charges in detail to them that I asked them with reference to each case whether or not they understood the charges and that they stated that they did.

"Q. Is it your opinion that each of these petitioners freely and voluntarily entered a plea of guilty with that understanding of their rights? A. That is my best judgment and opinion."

"Q. Did you state on direct examination that the appearance of the defendant in court and demeanor led you to believe that they understood the charges against them and their pleas of guilty and their waiver of counsel? A. I felt at the time they understood them. If that had not been my opinion I would not have accepted pleas of guilty in the case.

"Q. But at this time you cannot recall exactly what that appearance was? A.

Well I cannot tell you how they were dressed.

"Mr. Howard: That is all.

"The Witness: They impressed me that they knew what they were doing, if that is what you mean, but as to how they were dressed I cannot tell you that."

"Q. (By the Court.) I would like just for the record to ask one question. The petitioner, Woolard, has testified in this case that the only reference to counsel made when he was being arraigned was your statement that you would select an attorney for him but it would not do him any good. Was any such statement as that made? A. I did not make any such statement in this case and have never made any such statement in any case."

[20] See Footnote 2 to the Court's findings of fact made and filed as to each motion.

[21] In his petition Christakos avers that his sentence was for five years, while Woolard, in his confession, states that he received an eight year sentence.

[22] See e. g. Harris v. United States, 331 U.S. 145, at page 156, 67 S.Ct. 1098, at page 1104, 91 L.Ed. 1399, wherein it was written: "If only the fate of the Davises and the Harrises were involved, one

of mind of each accused, who, with full knowledge of the enormities of his immediately past transgressions, elected to waive counsel and plead guilty to charges of comparatively light offenses.[23]

It is my considered opinion that each movant "competently, intelligently and with full understanding of the implications," waived his constitutional right to counsel and entered his plea of guilty to each indictment pending against him. Each motion accordingly will be denied.

might be brutally indifferent to the ways by which they get their deserts. But it is precisely because the appeal to the Fourth Amendment is so often made by dubious characters that its infringements call for alert and strenuous resistance. Freedom of speech, of the press, of religion, easily summon powerful support against encroachment. The prohibition against unreasonable search and seizure is normally invoked by those accused of crime, and criminals have few friends. The implications of such encroachment, however, reach far beyond the thief or the black-marketeer. I cannot give legal sanction to what was done in this case without accepting the implications of such a decision for the future, implications which portend serious threats against precious aspects of our traditional freedom."

23 In his testimony before me each movant was given full opportunity to read and ponder his written confession. In response to my questions each reaffirmed the truth of his statements contained therein in so far as they reflected his own conduct and activities.