WOOLARD, et al. v. UNITED STATES

No. 12834.

United States Court of Appeals
Fifth Circuit.

Dec. 2, 1949.

Rehearing Denied Jan. 3, 1950.

Charles L. Howard, Jr., Birmingham, Ala., John S. Foster, Birmingham, Ala., for appellants.

John D. Hill, U. S. Attorney, Birmingham, Ala., for appellee.

Before HUTCHESON, McCORD, and RUSSELL, Circuit Judges.

McCORD, Circuit Judge.

Appellants, Robert Stanley Woolard and Louis Edward Christakos, prosecute this joint appeal in forma pauperis from a final order of the District Court for the Northern District of Alabama overruling their motions to vacate and set aside various sentences imposed upon them by said court on April 20, 1945. Title 28 U.S.C.A. § 2255.

The sentences here complained of were separately imposed under several indictments variously charging petitioners with violations of: (1) Title 18 U.S.C.A. § 415 [now § 2314] (National Stolen Property Act); (2) Title 18 U.S.C.A. § 87 [now § 641] (embezzling and transporting military arms and stores); (3) Title 18 U.S. C.A. § 408 [now §§ 2311–2313] (National Motor Vehicle Theft Act); (4) Title 18 U.S.C.A. § 76 [now § 912] (impersonating United States Army Officer); and (5) Title 10 U.S.C.A. § 1393 (unlawful wearing of military uniform). Upon conviction of all the above listed offenses,[1] appellant Christatkos was awarded an aggregate sentence of seventeen years and two days in the penitentiary. Woolard, who was neither indicted nor convicted under Title 18 U.S. C.A. § 415,[2] received a sentence of one year and a day less than Christakos, or approximately sixteen years in the penitentiary.

We have carefully and painstakingly reviewed every phase of the voluminous record testimony, as well as the lengthy motions filed by petitioners pro se and the exhaustive briefs of learned and able counsel appointed by the court to represent them. Almost without exception the numerous specifications of error assigned are totally lacking in substance and wholly without merit. In the main, we are in accord with the view of the trial court and counsel for petitioners that the question presented is whether the district court lost jurisdiction over appellants for its alleged failure to appoint counsel to represent them upon their arraignment and plea of guilty, or whether they intelligently waived their constitutional right to counsel before their sentences were imposed.

No good or useful purpose would be served by reviewing the evidence at length. We consider it sufficient to observe that appellants, after escaping from a military stockade at Camp Bowie, Texas, where they were serving heavy sentences of an Army general court martial for desertion during the recent war, embarked upon a tour of crime and violence through the states of Texas, Louisiana, and Alabama, while masquerading as officers of the United States Army in stolen uniforms. In the course of their wild escapade they committed several offenses which measured to grand larceny, stole and transported at least two automobiles, committed two armed robberies and other lesser offenses. In separate written confessions given prior to their arraignment and sentence, as well as in their own testimony upon the hearing below, appellants reveal undeniably their guilt of the various crimes charged.[3]

1. Another indictment laid under Title 18 U.S.C.A. § 408 (National Motor Vehicle Theft Act) was nol prossed at the arraignment and sentence of petitioners.

2. Christakos' conviction under this statute was for transmitting a fraudulent check in interstate commerce.

3. The confession of Christakos, in all material particulars, substantially corroborates that of Woolard; it reads as follows:

"I Louis Edward Christakos, voluntarily make the following statement to Winston Brooke, whom I believe to be a Special Agent of the Federal Bureau of Investigation. No threats of harm or hope of favors have caused me to make this statement. I have been told I do not have to make any statement and that any statement I make will be used against me.

"In January, 1945 I was confined to the Stockade, Camp Bowie, Texas as a General Prisoner. About a week prior

to Jan. 19, 1945, another General Prisoner there whose name is Robert H. Gaffney, was visited by an Army Chaplin. Later I was told by Robert S. Willard (Woolard) that he had posed as this Chaplin who visited Gaffney and that he, Willard (Woolard), was an escapee from Camp Gruber, Okla. Gaffney and this Chaplin who was in fact Willard, planned that Gaffney would escape from the Camp Bowie stockade. After this, Gaffney brought Jesse F. Ferrell and myself into this escape plan.

"On Friday, Jan. 19, 1945, Gaffney, Ferrell, and myself were assigned to a work detail at the Ammunition Dump. About three p. m., Willard came to the Depot in a Chaplin uniform and visited with Gaffney and me. He gave me a .45 calibre automatic pistol; however, this is not the pistol found on me when I was arrested Jan. 29, 1945. However, I did see this pistol in possession of the F. B. I. on Jan. 29, 1945. At that meeting, Willard, Gaffney, and I made and later carried out the following plan.

"When the 'Chaplin' left, I told the guard that I had lost my crucifix at Magazine #7. So, he took Gaffney, Ferrell, myself, and some others to Magazine #7. When we got there, I pulled the .45 automatic on the guard. Gaffney took the guard's gun, an Army carbine with an "L" type sight. Then we locked the guard and some others in the magazine, Gaffney, Ferrell, and I went over the fence which surrounds the Ammunition Dump. Willard was parked in a late model Buick, two-tone green. We drove on off the reservation, and headed for Beaumont, Texas to see Ferrell's sister. We took turns driving and slept en route. We arrived in Beaumont the next day, Jan. 20, 1945, about noon to the best of my recollection.

"We didn't stay in Beaumont very long, but headed for Louisiana. Our next stop of any length of time was in Alexandria, Louisiana, where we stopped at a tourist camp. To the best of my memory, we arrived in Alexandria Tuesday morning, Jan. 23, 1945. Soon after we arrived, we went to Camp Livingston and raided two or three officers cabins for the purpose of obtaining officers' uniforms. At Camp Livingston, we stole a couple of radios, one Army Carbine, and one .45 Automatic, and three complete uniforms, one each for Gaffney, Ferrell, and myself. Gaffney and I took First Lieutenant uniforms and Ferrell a Second Lieutenant's. Willard changed insignia and became a First Lieutenant in the infantry.

"We also raided Camp Claiborne, La. This may have been the same day or on another day. We went into two or three officers cabins and stole one radio, some whiskey, some insignias, possibly a trench coat, and that's about all.

"We also got another Army Carbine, but where it came from I do not know.

"That night, Gaffney and I left Ferrell and Willard at the Tourist Camp and started to a show. We picked up some girls at a Bowling Alley and later that night had a wreck in the Buick. This is the same Buick we got into when we escaped from Camp Bowie.

"Two negroes in an old Army vehicle picked us up and carried us to the town (not Alexandria) where the girl lived. When we got there, this girl saw a man she knew and got him to take Gaffney, who was badly hurt, to Camp Livingston in his Studebaker. The girl and I went along. Gaffney and the girl stayed at the hospital, and the man took me back to the Tourist Camp in his Studebaker. This car is a 1942 tan and black sedan.

"Back at the Tourist Camp, I told the others what had happened. We decided it would be best to steal the Studebaker, and get away immediately. So we asked the man to take us—Ferrell, Willard, and myself back to Camp Livingston.

"On the way to Camp Livingston, we held up the man and took his car. We then took this man back to the Tourist Camp, bound him up, and then left. This man's name was John D. something. I remember that when we left him, he begged us to take him with us.

"We drove the Studebaker to Greenwood, Mississippi, and stopped there to get the car fixed. We asked the mechanic where we could buy some whiskey and he pointed out a place. I went there with the mechanic and bought a quart of whiskey for ten dollars. That night we went back and robbed the man who sold me the whiskey. Ferrell stayed in the car and Willard and I went in. Willard and I had a .45 Automatic each. We robbed this man of about one thousand dollars, about two gallons of whiskey, some gas stamps for better than two hundred gallons, and a .38 caliber Smith and Wesson revolver. My share of the money was one third and amounted to between three and four hundred dollars.

"We then left Greenwood, Miss. and drove the Studebaker straight to Birmingham, Alabama.

"We have been in Birmingham ever since and have been staying at the Old Glory Tourist Camp between Birmingham and Bessemer.

It is settled law that the Sixth Amendment of the Federal Constitution does not require that counsel be forced upon a competent defendant by a court, and that a defendant charged with a federal offense who is aware of his constitutional privilege to have counsel appointed to represent him, may nevertheless waive such right. Adams v. U. S. ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435; Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357; Ossenfort v. Pulaski, 5 Cir., 171 F.2d 246.

Our Court of Last Resort, in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 1023, first laid down the general rule as to the test to be applied in determining whether or not an accused has intelligently waived his constitutional right to counsel wherein it held:

"The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." See also, Adams v. U. S. ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435.

The record reveals that appellants were fully aware prior to their sentence and conviction of the nature and substance of the charges against them, for it appears they were arraigned before a U. S. Commissioner on a charge of violation of the Dyer Act on January 31, 1945, and again arraigned before another Commissioner on the remainder of the charges, for which they were later indicted, on March 15, 1945. Moreover, during the period of their confinement while awaiting trial they were afforded opportunity to consult and employ counsel, and in fact did consult an attorney regarding representation in their cases, even though they were refused. Cf. Ossenfort v. Pulaski, 5 Cir., 171 F.2d 246. It further appears that these appellants, at the time they committed their offenses, were not naive, innocent, and inexperienced youths, but men of unusual intelligence, shrewdness, and cunning, as evidenced by their frequent escapes from both the Army military authorities and Federal apprehension,[4] as well as by the petitions they have prepared largely through their own efforts while incarcerated in the penitentiary.

The record further shows that the presiding judge of the federal district court at Birmingham, Alabama, who arraigned

"On Monday, Jan. 29, 1945, I bought a ring with seven stones in it from Bracklin's Jewelry Store, Birmingham. It cost about $150.00 for I gave a three hundred dollar check and received the difference in cash. This check was fraudulent and I knew it. I presented myself to Bracklin as a First Lieutenant in the U. S. Army, when in fact I was not.

"At the time of my arrest on Jan. 29, 1945, I was wearing the uniform of a First Lieutenant in the U. S. Army. I had stolen their uniforms at Camp Livingston, La., and had no right to wear the uniform or the rank. I also had in my possession a .45 Automatic pistol which was stolen at Camp Livingston, La.

"With reference to the Buick automobile in which we rode from Camp Bowie to Alexandria, La., I realized this was a stolen car.

"I have read this and the preceeding six pages and have been given an oppor-

tunity to make any changes I desire. This statement is true to the best of my knowledge and belief.

(S.) Louis E. Christakos."

4. Before committing the crimes in question Woolard, who had finished the 8th grade in school, had deserted the Army, was apprehended by the military authorities, escaped from military custody on three separate occasions, stood trial before a general court martial, and was sentenced to eight years confinement.

Christakos, who had a year and a half of high school education, had been convicted for a Federal violation prior to his entry into the service, but was given a suspended sentence. His probation was subsequently revoked, and a penitentiary sentence was abated upon condition that he join the Army. He deserted the service after his induction, and later made good his escape from general court-martial confinement with Woolard.

and sentenced these petitioners testified at the hearing on these motions. His testimony is forthright, clear, and convincing to the effect that he informed each defendant of the charges pending against him in each indictment, and even required the United States Attorney to read the indictments aloud to them; that he explained to each appellant separately his right to have counsel appointed to represent him, and offered to have counsel appointed for them if they so desired.[5] Each appellant thereupon stated to the court that he did not desire counsel appointed for him, but that he desired to waive his rights in this regard, whereupon the appropriate entry was recorded in the court docket[6] and sentence was imposed.

The cases of Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309, and Uveges v. Pennsylvania, 335 U.S. 437, 69 S.Ct. 184, relied upon by appellants, are clearly distinguishable under their own facts, and are in nowise applicable or controlling in favor of appellants here. Ossenfort v. Pulaski, 5 Cir., 171 F.2d 246; U. S. v. Christakos, D.C., 83 F.Supp. 521.

In the case of Christakos v. Hunter, 161 F.2d 692, the Court of Appeals for the Tenth Circuit, on petition for habeas corpus, passed upon the precise issue here raised as to the intelligent waiver of counsel adverse to the appellant Christakos. Moreover, upon application for certiorari being duly filed, our Court of Last Resort declined to review that decision, 332 U.S. 801, 68 S.Ct. 92, 92 L.Ed. 381, certiorari denied. While, of course, we are not bound to follow that decision, or attach any legal significance or presumption to the denial of its review, we nevertheless advert to it as a pertinent factor to be considered in ruling on these motions.

Viewing the record fully and fairly in its entirety, we find no legal basis or support for the contention that appellants were deprived of their right to counsel, or that in waiving their right they were not fully informed of the import of their election and of the nature and substance of the charges against them. Adams v. U. S. ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435; Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357; Ossenfort v. Pulaski, 5 Cir., 171 F.2d 246; U. S. v. Christakos, D.C., 83 F.Supp. 521; Christakos v. Hunter, 10 Cir., 161 F.2d 692, certiorari denied 332 U.S. 801, 68 S.Ct. 92, 92 L.Ed. 381; Cf. Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309; Uveges v. Pennsylvania, 335 U.S. 437, 69 S.Ct. 184.

---

5. Judge Mullins, called as a witness by the court, testified as follows: "* * * I explained in a general way the charges against him that were contained in the various indictments against him. I either asked him if he was able to hire counsel and he replied that he was not, or I assumed that he was not able to hire counsel due to the fact that he was in custody. I do not recall which. At any rate I advised him at the time that it was the duty of the Court to appoint counsel to represent him in the case if he wanted counsel, and my best recollection is that I told him that I would appoint counsel to represent him or an attorney to represent him, who would represent him free of charge, that he would be under no obligation to pay the attorney anything for representing him in the case."

"Q. Was it also your judgment and opinion at that time from the appearance and demeanor, the apparent intelligence and bearing of each petitioner, that he understood the nature of the charges against him? A. That is my judgment and my best recollection, is that after the District Attorney had explained the charges in detail to them that I asked them with reference to each case whether or not they understood the charges and that they stated that they did.

"Q. Is it your opinion that each of these petitioners freely and voluntarily entered a plea of guilty with that understanding of their rights? A. That is my best judgment and opinion."

6. The minute entry in each case upon which the appellants were sentenced reads as follows:
"* * * each defendant having been advised of his constitutional right to counsel and each having been asked whether he desired counsel assigned by the court, each replied that he did not." In this connection, see the decision of this court in Ossenfort v. Pulaski, 5 Cir., 171 F.2d 246.

89

It follows that the judgment should be, and the same is accordingly

Affirmed.

HUTCHESON, Circuit Judge (concurring).

The judgment appealed from and here affirmed was entered by the district judge after an extended hearing conducted with the assistance of able counsel in an atmosphere of complete impartiality and with eye single to ascertaining the truth and right of the complaints made. In an able opinion, United States v. Christakos, D.C., 83 F.Supp. 521, the district judge has set the facts out fully and fairly, and correctly and clearly stated the applicable principles of law. I agree fully with what is said in that opinion. I concur fully in the affirmance of the judgment.