**UNITED STATES of America**

v.

**Robert G. LAZAR et al.**

**Crim. No. 72-295.**

United States District Court,
E. D. Pennsylvania.

Sept. 5, 1972.

M. Lazan, Asst. U. S. Atty., Philadelphia, Pa., for United States.

Louis Lipschitz, H. P. Voldow, L. W. Fryman, Eugene E. Kellis, Philadelphia, Pa., for defendants.

OPINION

MASTERSON, District Judge.

The above named defendants are charged in a thirty-four (34) count indictment with certain criminal acts in connection with representations made to the Federal Housing Administration (hereinafter "F.H.A.") and fraudulent use of the words "Federal Housing Administration" in advertising.[1] Presently

---

1. Specifically, the indictment lists three types of criminal activity: fraudulent certifications as to the condition of the electrical systems at various locations (18 U.S.C. §§ 1001, 1002); false advertisements as to F.H.A. inspection and

before us are Motions to Suppress Evidence on which we have conducted hearings on June 20, 1972 and June 27, 1972.

## I.  THE FACTS [2]

On November 15, 1971, Magistrate Richard A. Powers signed a Search Warrant which described the following property which was believed to be concealed at Lazar Realty, First Floor, 4946 Germantown Avenue, Philadelphia, Pennsylvania:

> "About 50 blank certificates on the letterhead of David Miller, Electrical Contractor, 8311 Strahle Place, Philadelphia, Pennsylvania, and signed in blank and typewriters used in the operations of Lazar Realty, which are to be used as a means of violating 18 United States Code § 1010."

Special Agent Gordon N. Zacrep of the Federal Bureau of Investigation attested to the following as grounds for the issuance of a Search Warrant:

> "Ronald Miller, the son of David Miller told the affiant that he gave the said blank certificates to Robert Lazar of Lazar Realty, on the premises of Lazar Realty, at 4946 Germantown Avenue, Philadelphia, Pa. on or about November 5, 1971, and that it has

been the practice of Ronald Miller and David Miller over the past 2 years to give blank certifications to Lazar Realty, and it is the practice of Lazar Realty to submit through a mortgage such certifications to the Federal Housing Administration, under Federal Housing Administration programs, 235 and 221(d)(2), and affiant has reviewed certain FHA file binders in which Lazar Realty was involved and in said file binders there was included certifications on the letterhead of Ronald Miller and other certifications which had all been typed on the same typewriter."

The search was conducted later that day.  In addition to the 50 blank certificates and typewriters specified in the warrant, a large number of items not so specified were seized and listed in the agents' inventory.[3]  Because the pivotal question to be decided is whether these unspecified items were lawfully seized pursuant to the search for which the warrant had been issued, the precise sequence of events during the search is crucial.  On this point, we are faced with conflicting testimony.

Agent Zacrep testified that when he and three other agents arrived at Lazar Realty, Mr. Robert Lazar called his at-

---

approval of various properties (18 U.S.C. § 709) and false statements to the F.H.A. as to liens on certain properties in order to obtain F.H.A. acceptance of mortgages for such properties (18 U.S.C. §§ 1010, 1012).

2. The following facts are undisputed unless otherwise indicated.

3. The agents' inventory reads as follows:
   "1. Typewriting samples from eight typewriters . . . (8 samples).
   2. B & D Roofing & General Contracting certificates signed by Robert C. Bauman (10 items).
   3. Roofing certificates signed by Robert C. Bauman (4 copies) and one signed electrical certification.
   4. Blank certifications signed by Robert C. Bauman (2 copies) and short hand pad.
   5. Four notebooks . . .

6. Two pages of telephone addresses & numbers.
7. File of electrical certifications with name Ron Miller on file binder.  Approximately 320 copies of which 250 were signed.
8. Folder of blank plumbing and heating letterheads. . . .
9. Files containing sale of property at the following addresses (23 addresses omitted).
10. Ledger sheet captioned 'Loans Receivable' and check stubs for 1970 and part of 1969.
11A. Binders on sale of following properties (11 addresses omitted).
B. Statements of homeowners at following addresses (8 omitted).
C. Property Listing.
12. Cash Receipts.
13. Document Folder of Eastern Home certifications."

torney. After that Mr. Lazar voiced no objection and the search progressed. Mr. Lazar was told that the agents were looking for the blank certificates, and he replied, "Yes, we have such certificates." (N.T. 19).[4] However, Agent Zacrep couldn't recall whether Mr. Lazar offered to give him the blank certificates. (N.T. 20). This may have been because of the fact that the agents were in different rooms. (N.T. 27). He does recall, though, that while searching for the blank certificates, he came across evidence of other F.H.A. violations. (N.T. 25).

Agent James H. McGauley confirmed Lazar's calling his attorney upon their arrival. He and another agent began to search a room at the rear of the premises. Prior to finding the specified certificates in the desk of Dorothy Sionsky, he found evidence of loans made to purchasers of properties obtained with an F.H.A. insured mortgage. (N.T. 37). He testified that it is "vaguely possible" that Dorothy Sionsky indicated that there were certificates in her desk. (N.T. 38). However, he was sure that the fifty blank certificates were obtained after about an hour, but that the search continued for at least two hours. (N.T. 40). He justified this extension of the search after the subject matter of the warrant had been obtained as follows:

"THE COURT: Well then, if you got the subjects of the warrant after an hour, what was the basis of your continuing the search for another two hours?

THE WITNESS: Yes, sir. Before the certifications were found I had found other indications of possible federal violations in my search of trying to find these blank certifications. Those indications of possible federal violations was the fact that loans, as indicated on the jackets of properties that were sold. There was indication on there that loans had been made to the respective purchasers of those homes. Those loans, the purchasers of those homes being secured by Federal Housing Administration insured mortgage. I know that to be a federal violation, and upon seeing them I of course, took them. And finding some, we proceeded to search for others in that same room."

Defendant Dorothy Sionsky, secretary to Robert Lazar, testified that although she did not hand anything to the agents during the course of the search, she did hand a file containing the blank certificates specified in the warrant to Mr. Lazar. Mr. Lazar handed the file to the agents immediately thereafter, approximately twenty (20) minutes after the search commenced. (N.T. 76).[5] This was confirmed by defendants Barbara Lazar and Robert Lazar. (N.T. 83, 87).

## II. THE VALIDITY OF THE WARRANT.

### A. THE SUBJECT MATTER OF THE WARRANT.

■ Defendants rely on United States ex rel. Campbell v. Rundle, 327 F.2d 153 (3rd Cir. 1964) for the proposition that probable cause for the search was not established because the "facts described in the affidavit failed to establish that a criminal offense had been or was then being committed."[6] In that case a warrant authorizing a search for articles allegedly used to procure abortions was held to be defective for failure to state that any crime "had been committed, was being committed, or was about to be committed, in Pennsylvania

---

4. All citations to Notes of Testimony refer to the hearing conducted June 20, 1972 unless otherwise indicated.

5. This citation and that which follows refers to the hearing of June 27, 1972.

The pages of this transcript were not numbered consecutively to those of the prior hearing.

6. Memorandum Sur Motion to Suppress Evidence, p. 3.

or elsewhere." 327 F.2d at 162. However, it is obvious that the case at bar is distinguishable in that the affiant stated that blank certifications had been used illegally over a two (2) year period. Further, while possession of articles and instruments to procure an abortion was not illegal under Pennsylvania law, the mere possession of blank certificates with intent to defraud the United States through the F.H.A. is in itself defined as a crime in the United States Code.[7]

## B. RELIABILITY OF THE INFORMANT.

■ Defendants argue that the affiant's account of his conversations with Ronald Miller, whose reliability had never been established, was insufficient to furnish probable cause. We disagree.

Defendant's reliance on recent Supreme Court cases is misplaced. The Court held in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), that an affidavit of an unidentified informant must set forth "some of the underlying circumstances from which the informant concluded that the narcotics . . . . was 'credible' or his information 'reliable.'" 378 U.S. at 114, 84 S.Ct. at 1514. Having found the informant's tip inadequate under *Aguilar*, the Court subsequently held that the remaining allegations of the affidavit must provide independent corroboration of the informant. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L. Ed.2d 637 (1969).

In the case at bar, not only was the informant named, but the recounting of personal and recent observations of criminal activity tend to show that the information had been gained in a reliable manner. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Further, as in the last case, Miller's placing himself in the illegal chain of possession and representation to the F.H.A. provided independent corroboration by furnishing the F.B.I. with information as to the location of evidence of *his own* criminal activity:

"While a bare statement by an affiant that he believed the informant to be truthful would not, in itself, provide a factual basis for crediting the report of an unnamed informant, we conclude that the affidavit in the present case contains an ample factual basis for believing the informant which, when coupled with affiant's own knowledge of the respondent's background, afforded a basis upon which a magistrate could reasonably issue a warrant. The accusation by the informant was plainly a declaration against interest since it could readily warrant a prosecution and could sustain a conviction against the informant himself.

. . .

"Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." 403 U.S. at 579–580, 583, 91 S.Ct. at 2080, 2082.

## III. THE SCOPE OF THE SEARCH AND SEIZURE.

■ While our conclusions as to the validity of the warrant itself upholds

---

7. 18 U.S.C. § 1002 provides as follows:
*"Possession of false papers to defraud United States.*
Whoever knowingly and with intent to defraud the United States, or any agency thereof, possesses any false, altered, forged, or counterfeited writing or document for the purpose of enabling another to obtain from the United States, or from any agency, officer or agent thereof, any sum of money, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

the legality of the seizure of items named therein, the seizure of the items not so specified raises serious constitutional questions. It is obvious to us that the search and seizure continued for almost three hours beyond the point when the certifications specified in the warrant had been obtained. While we do not find to be credible defendants' testimony that the specified certifications were *given* to the agents before any search of the premises began, it is clear that, according to the agents' candid explanation of their actions, few of the seized items were located before the "50 blank certifications." The question presented, therefore, is whether the agents' inadvertent discovery of what they believed to be incriminating evidence allowed them to continue to search after all of the items specified in the warrant had been located.

We recognize that "if entry upon the premises be authorized and the search which follows be valid, there is nothing in the Fourth Amendment which inhibits the seizure by law-enforcement agents of . . . property the possession of which is a crime, even though the officers are not aware that such property is on the premises when the search is initiated." Harris v. United States, 331 U.S. 145, 155, 67 S.Ct. 1098, 1103, 91 L.Ed. 1399 (1947). See also Warden v. Hayden, 387 U.S. 294, 87 S. Ct. 1642, 18 L.Ed.2d 782 (1967) (rejecting the distinction between an "instrumentality of crime" and "mere evidence"). The rationale of this narrow exception to the requirements that warrants shall particularly describe the things to be seized [8] was most recently stated by the Supreme Court in Coolidge v. New Hampshire, 403 U.S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971):

"An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character. . . .

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification— . . . a warrant for another object . . . .—and permits the warrantless seizure. *Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges. . . .*" 403 U.S. at 465–466, 91 S.Ct. at 2037–2038 (emphasis added).

The *inadvertent* discovery of incriminating evidence *before* the specified certifications were found allowed seizure of such evidence under this doctrine. However, we are convinced that what ensued, after the specified items were obtained, was a "general, exploratory rummaging" *through the offices of Lazar Realtors,* forbidden by the Fourth Amendment. Coolidge v. New Hampshire, *supra*, at 467, 91 S.Ct. 2022.[9]

---

8. See Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); Rule 41, Federal Rules of Criminal Procedure.

9. "Given the initial intrusion, the seizure of an object in plain view is consistent with the second objective [of the warrant requirement that those searches deemed necessary should be as limited as possible], since it does not convert the search into a general or exploratory one." 403 U.S. at 467, 91 S.Ct. at 2039.

We hold that the evidence seized after the agents secured the items specified in their warrant must be suppressed. Counsel are directed to file a detailed Order so indicating.